2004 WY 110

**George VIGIL, Appellant (Defendant),**

v.

**The STATE of Wyoming, Appellee (Plaintiff).**

**No. 03–22.**

Supreme Court of Wyoming.

Sept. 24, 2004.

**174**

Before HILL, C.J., and GOLDEN, LEHMAN, KITE, and VOIGT, JJ.

GOLDEN, Justice.

[¶ 1]  George Vigil (Vigil) appeals from a judgment and sentence resulting from his conviction of aggravated assault and battery in violation of Wyo. Stat. Ann. § 6–2–502(a)(iii).[1]  On appeal, Vigil contends that his constitutional right to be represented by counsel at every critical stage of a criminal proceeding was violated when his request for a court appointed attorney was denied at his preliminary hearing.  He also contends that certain hearsay evidence was admitted at his trial in violation of his constitutional right to confrontation.  Finding that Vigil's right to confrontation was violated, we reverse and remand for a new trial.

## ISSUES

[¶ 2]  Vigil presents the following issues:

I.  Was Appellant denied his right to counsel during the preliminary hearing in violation of the Sixth and Fourteenth Amendments of the United States Constitution and Art. 1 § 10 of the Wyoming Constitution?

    A.  Did the Justice of the Peace abuse his discretion by denying Appellant his right to counsel at the Preliminary Hearing in violation of Appellant's Constitutional Rights?

    B.  Was Appellant's abrupt waiver of Counsel knowingly, intelligently and voluntarily waived?

II.  Did the trial court abuse its discretion by allowing hearsay statements to be made violation [sic] Appellant's confrontation clause rights under the Wyoming Constitution and the United States Constitution?

Representing Appellant:  Kimberly A. Corey of Plains Law Offices, Cheyenne, Wyoming;  Donna Domonkos, Appellate Counsel, State Public Defender's Office, Cheyenne, Wyoming.  Argument by Ms. Corey.

Representing Appellee:  Patrick J. Crank, Wyoming Attorney General;  Paul S. Rehurek, Deputy Attorney General;  D. Michael Pauling, Senior Assistant Attorney General;  Theodore E. Lauer, Director, and Dana Lent, Student Intern, of the Prosecution Assistance Program.  Argument by Ms. Lent.

---

1. § 6–2–502.  Aggravated assault and battery; penalty.
(a) A person is guilty of aggravated assault and battery if he:
    (i) Causes serious bodily injury to another intentionally, knowingly or recklessly under circumstances manifesting extreme indifference to the value of human life;
    (ii) Attempts to cause, or intentionally or knowingly causes bodily injury to another with a deadly weapon;
    (iii) Threatens to use a drawn deadly weapon on another unless reasonably necessary in defense of his person, property or abode or to prevent serious bodily injury to another;  or
    (iv) Intentionally, knowingly or recklessly causes bodily injury to a woman whom he knows is pregnant.
(b) Aggravated assault and battery is a felony punishable by imprisonment for not more than ten (10) years.

A. Did the district court abuse its discretion by allowing hearsay statements to be made at trial that were not against codefendant's pecuniary interest?

B. Did the trial court abuse its discretion by allowing codefendant's statements to be made by an Officer when the indicia is unreliable thereby violating Appellant's right to confront the witnesses against him?

The State restructures the issues slightly:

I. Did appellant knowingly and voluntarily waive his right to the assistance of counsel at the preliminary hearing and, in the alternative, forfeit that right by his conduct when he appeared without retained counsel?

II. Did the district court properly admit into evidence the statements of unavailable witness Jay Newton under Wyoming Rule of Evidence 804(b)(3)?

## FACTS

[¶ 3] The following facts pertinent to this appeal were adduced at trial. Vigil, Jay Newton (Newton), and a woman (hereinafter referred to as Victim) spent the afternoon and evening of April 30, 2002, drinking and smoking marijuana in an auto body shop where Vigil was working. Ultimately, Newton and Victim engaged in sexual relations. Victim claims she only engaged in sexual relations with Newton because Vigil held a machete type knife to her throat and threatened to kill her if she refused. Newton's defense from the beginning was that he only entered the back seat with Victim and at least initially only pretended to have sex with her to protect Victim from Vigil.

[¶ 4] At trial, Victim testified that the alleged assault began when Vigil slapped her on the buttock with his belt, at which point she turned around and slapped him. The slap made Vigil angry and, according to Victim, Vigil then threw her against the back of a car being worked on in the shop and held a machete type knife to her throat, threatening to cut her up into small pieces and burn the pieces in the stove[2] so they would never be found. Vigil then allegedly cut a small chunk

of Victim's hair from her head. Victim testified that Vigil ordered her to have sex with Newton and that Vigil would be next.

[¶ 5] Victim testified that after Vigil threatened her with the machete type knife, Victim and Newton then entered the back seat of the car. Victim and Newton proceeded to engage in sexual activities in the back seat of the car. Victim testified that Vigil looked into the car a couple of times. Victim and Newton emerged once to smoke a cigarette, at which point Victim testified that Vigil was sleeping on a couch in the shop. Victim and Newton reentered the car and continued their sexual activities. When they emerged in the early morning hours of May 1, 2002, Vigil was still asleep on the couch. They woke Vigil up, and Victim asked him to drive her to her residence. Vigil complied, and the encounter ended.

[¶ 6] Sometime around mid-morning on May 1, 2002, Victim telephoned a friend and claimed she had been raped. Ultimately law enforcement was contacted, and Sheriff's Deputy Valerie Martin contacted Victim. Deputy Martin convinced Victim to go to the hospital where a sexual assault examination was conducted. At Vigil's trial, Deputy Martin testified that, when she first encountered Victim on May 1, Victim had multiple small bruises and abrasions on her body, although some of these could be attributed to a bicycle accident Victim was involved in earlier on April 30th. Deputy Martin observed a mark on Victim's lower back that Deputy Martin described as looking like a "rub area." Deputy Martin also testified that she noticed a small area of hair was missing from Victim's head. No bruising was found on Victim's buttocks during the physical exam at the hospital.

[¶ 7] Deputy Martin testified that she interviewed Victim after the physical examination. At that time, Victim identified Vigil and Newton as her assailants from respective photo lineups and both were subsequently arrested. Victim related to Deputy Martin that she had been sexually assaulted. Victim stated that Vigil had held a machete type knife to her throat and threatened to kill her

---

2. There was a large wood-burning stove located   in the shop.

if she resisted, and then Vigil cut a chunk of hair from her head.

[¶ 8] Deputy Martin, assisted by other law enforcement officers, executed a search warrant on the auto body shop. No machete type knife was discovered during the search, although Vigil admitted in an interview with a police officer that he owned such a knife and kept it at the shop. A few hairs were found on the trunk of the car where the alleged assault occurred. These hairs were collected as evidence, but testing on them proved inconclusive.

[¶ 9] At trial, Newton was called by the State as a witness against Vigil. Newton, as part of a plea bargain, had pled guilty and been sentenced regarding the subject events the day prior to Vigil's trial. Newton testified only to a few preliminary issues and then invoked his Fifth Amendment right against self-incrimination. The trial court accepted the invocation and declared Newton unavailable as a witness. The State then called the police officer who initially interviewed Newton upon Newton's arrest. Over defense objection, the officer proceeded to testify as to what Newton said during his interviews with Newton. In the interviews, Newton allegedly admitted to the officer that Vigil held a knife to Victim's throat but was not sure if he held the blade side or the blunt side of the knife to her throat. Newton also allegedly confirmed to the officer that Vigil threatened to cut Victim to pieces and burn the pieces in the stove. According to the police officer, Newton also stated that, when Newton and Victim emerged from the vehicle the first time to smoke a cigarette, Vigil walked over to them and asked if it was his turn yet.

[¶ 10] Vigil testified at trial. Vigil generally agreed with the version of events presented by Victim but denied ever threatening Victim with a knife. Vigil admitted that, because Victim was engaged in an activity of which he did not approve, and he could not get her attention otherwise, he lightly spanked Victim on her buttocks with his belt. Victim then turned around and slapped him, hitting him in the eye. Vigil admitted the slap made him angry and he grabbed Victim and scolded her about hitting him. Vigil denied ever having a knife in his hand or threatening her to make her submit to sexual activities with Newton or himself.

[¶ 11] Vigil testified that, after he admonished Victim, basically telling her not to hit him again, he then told her to sit in the back of the car because she was too drunk to stand. Vigil testified that he worked on another car while Victim and Newton were in the back seat of the initial car. Vigil confirmed that he did look into the car on a couple of occasions to see if Newton and Victim were still there. Vigil testified that, as far as he could tell, the sexual activity that occurred between Victim and Newton was consensual. Vigil testified that eventually he fell asleep on a couch in the shop and was awoken by Newton and Victim. He then gave Victim a ride to her residence at her request.

[¶ 12] Vigil was charged with two counts of being an accessory before the fact to the crime of sexual assault and one count of aggravated assault and battery. Ultimately, the jury acquitted Vigil of the accessory before the fact charges related to the alleged sexual assault but found Vigil guilty of aggravated assault and battery. This appeal followed.

## STANDARD OF REVIEW

[¶ 13] This Court initially will address Vigil's second issue because we find the issue dispositive of this appeal. Vigil contends that his right to confrontation of witnesses against him was denied when the police officer was allowed to testify at trial as to what Newton said when the officer interviewed Newton. Vigil argues the correct standard of review is whether the trial court abused its discretion in admitting the hearsay testimony into evidence. The State argues that Vigil did not object to the testimony on the grounds that it violated defendant's right to confrontation and thus the issue must be reviewed for plain error.

[¶ 14] Vigil objected to the testimony twice. The first objection was on the grounds of hearsay. A little later in the testimony of the police officer, Vigil's attorney again objected, stating: "not only do we not have Mr. Newton present to testify, we

have leading questions that are being asked of him. We don't have anything that shows that he was under oath when he was testifying, and we don't know if this interview was recorded or anything else." Essentially, we interpret this objection to challenge the reliability of the hearsay statement. The trial court seems to have interpreted the objection as one of lack of foundation and allowed the police officer to proceed with his testimony regarding what Newton had told him during his investigation after further facts regarding the interview were elicited.

[¶ 15] While the Confrontation Clause and hearsay may overlap, *see generally Hopkinson v. State*, 632 P.2d 79, 132 (Wyo.1981) ("we must incorporate any additional limits imposed upon the admissibility of hearsay by the Confrontation Clause of the Sixth Amendment to the U.S. Constitution and its Wyoming counterpart, § 10, Art. I, Wyoming Constitution"), they are distinct concepts and objections grounded upon these principles incorporate separate analyses. *See generally Sarr v. State*, 2003 WY 42, ¶¶ 13–30, 65 P.3d 711, ¶¶ 13–30 (Wyo.2003). Hence, separate objections should be made for hearsay violations and confrontation clause violations in order to fairly alert the trial court so it can make an informed decision based upon the specific legal issues involved.

[¶ 16] While perhaps not as artfully presented as might be advisable, we believe the objections presented by Vigil were sufficient to place the trial court on notice that Vigil's objections were grounded in the Confrontation Clause. Vigil's attorney's stated reasons for the objection refer to established requirements under the Confrontation Clause for the admission of hearsay evidence—the unavailability of the declarant and adequate indicia of reliability. *See generally Sarr*, ¶ 17. Importantly, Vigil's attorney specifically referred to the fact that Newton was not there to personally testify. As an objection, this goes to the Confrontation Clause. "When a hearsay objection is lodged, as here, on the grounds that the declarant has not been made available at trial and, as a result, cannot be subjected to cross-examination, the policy of the confrontation clause is invoked equally with that of the hearsay rule. We therefore hold that the hearsay objection lodged in the instant case adequately preserved the confrontation clause issue for review." *Dias v. State*, 95 Nev. 710, 601 P.2d 706, 709 (1979) (per curiam).

[¶ 17] Our review, therefore, is for evidentiary error.

Evidentiary rulings are within the sound discretion of the trial court and will not be disturbed absent a showing of a clear abuse of discretion. *Robinson v. State*, 11 P.3d 361, 367 (Wyo.2000). Moreover, a district court's judgment may be affirmed on any proper grounds supported by the record. *Bird v. Rozier*, 948 P.2d 888, 892 (Wyo.1997). Because the matter at hand involves a mixed question of fact and constitutional law, we independently review the record as suggested by *Lilly v. Virginia*, 527 U.S. 116, 119 S.Ct. 1887, 144 L.Ed.2d 117 (1999).

*Sarr*, ¶ 12. Erroneous evidentiary rulings will not be disturbed on appeal if the error is harmless. *Warner v. State*, 2001 WY 67, ¶ 29, 28 P.3d 21, ¶ 29 (Wyo.2001).

**DISCUSSION**

[¶ 18] The first issue for our determination is whether the introduction of the hearsay statements at issue was error. This issue has been definitively decided by the United States Supreme Court. The introduction of any testimonial hearsay evidence violates the Confrontation Clause unless the declarant is legally unavailable and the defendant has had a prior opportunity to cross-examine the declarant:

[T]he Framers would not have allowed admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination. The text of the Sixth Amendment does not suggest any open-ended exceptions from the confrontation requirement to be developed by the courts.

*Crawford v. Washington*, 541 U.S. 36, ——, 124 S.Ct. 1354, 1365, 158 L.Ed.2d 177 (2004). The *Crawford* Court specifically overruled

prior precedent that allowed hearsay statements of an unavailable declarant to come into evidence if it fit within a "firmly rooted hearsay exception" or bears "particularized guarantees of trustworthiness" as initially developed in *Ohio v. Roberts*, 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980):

> The legacy of *Roberts* in other courts vindicates the Framers' wisdom in rejecting a general reliability exception. The framework is so unpredictable that it fails to provide meaningful protection from even core confrontation violations.

Reliability is an amorphous, if not entirely subjective, concept. There are countless factors bearing on whether a statement is reliable; the nine-factor balancing test applied by the Court of Appeals below is representative. See, *e.g., People v. Farrell*, 34 P.3d 401, 406–407 (Colo.2001) (eight-factor test). Whether a statement is deemed reliable depends heavily on which factors the judge considers and how much weight he accords each of them. Some courts wind up attaching the same significance to opposite facts. For example, the Colorado Supreme Court held a statement more reliable because its inculpation of the defendant was "detailed," *id.,* at 407, while the Fourth Circuit found a statement more reliable because the portion implicating another was "fleeting," *United States v. Photogrammetric Data Servs., Inc.,* 259 F.3d 229, 245 (C.A.4 2001). The Virginia Court of Appeals found a statement more reliable because the witness was in custody and charged with a crime (thus making the statement more obviously against her penal interest), see *Nowlin v. Commonwealth,* 40 Va.App. 327, 335–338, 579 S.E.2d 367, 371–372 (2003), while the Wisconsin Court of Appeals found a statement more reliable because the witness was *not* in custody and *not* a suspect, see *State v. Bintz,* 2002 WI App. 204, ¶ 13, 257 Wis.2d 177, 187, 650 N.W.2d 913, 918. Finally, the Colorado Supreme Court in one case found a statement more reliable because it was given "immediately after" the events at issue, *Farrell, supra,* at 407, while that same court, in another case, found a statement more reliable because two years had elapsed, *Stevens v. People,* 29 P.3d 305, 316 (Colo.2001).

The unpardonable vice of the *Roberts* test, however, is not its unpredictability, but its demonstrated capacity to admit core testimonial statements that the Confrontation Clause plainly meant to exclude. Despite the plurality's speculation in *Lilly,* 527 U.S., at 137, 119 S.Ct. 1887, that it was "highly unlikely" that accomplice confessions implicating the accused could survive *Roberts,* courts continue routinely to admit them. See *Photogrammetric Data Servs., supra,* at 245–246; *Farrell, supra,* at 406–408; *Stevens, supra,* at 314–318; *Taylor v. Commonwealth,* 63 S.W.3d 151, 166–168 (Ky.2001); *State v. Hawkins,* No.2001–P–0060, 2002 WL 31895118, ¶¶ 34–37, *6 (Ohio App., Dec. 31, 2002); *Bintz, supra,* ¶¶ 7–14, 257 Wis.2d, at 183–188, 650 N.W.2d, at 916–918; *People v. Lawrence,* 55 P.3d 155, 160–161 (Colo.App.2001); *State v. Jones,* 171 Ore.App. 375, 387–391, 15 P.3d 616, 623–625 (2000); *State v. Marshall,* 136 Ohio App.3d 742, 747–748, 737 N.E.2d 1005, 1009 (2000); *People v. Schutte,* 240 Mich.App. 713, 718–721, 613 N.W.2d 370, 376–377 (2000); *People v. Thomas,* 313 Ill.App.3d 998, 1005–1007, 246 Ill.Dec. 593, 730 N.E.2d 618, 625–626 (2000); cf. *Nowlin, supra,* at 335–338, 579 S.E.2d, at 371–372 (witness confessed to a related crime); *People v. Campbell,* 309 Ill.App.3d 423, 431–432, 242 Ill.Dec. 694, 699, 721 N.E.2d 1225, 1230, (1999) (same). One recent study found that, after *Lilly,* appellate courts admitted accomplice statements to the authorities in 25 out of 70 cases—more than one-third of the time. Kirst, Appellate Court Answers to the Confrontation Questions in *Lilly v. Virginia,* 53 Syracuse L.Rev. 87, 105 (2003). Courts have invoked *Roberts* to admit other sorts of plainly testimonial statements despite the absence of any opportunity to cross-examine. See *United States v. Aguilar,* 295 F.3d 1018, 1021–1023 (C.A.9 2002) (plea allocution showing existence of a conspiracy); *United States v. Centracchio,* 265 F.3d 518, 527–530 (C.A.7 2001) (same); *United States v. Dolah,* 245 F.3d 98, 104–105 (C.A.2 2001) (same); *United States v. Petrillo,* 237 F.3d 119, 122–123 (C.A.2

2000) (same); *United States v. Moskowitz,* 215 F.3d 265, 268–269 (C.A.2 2000) (same); *United States v. Gallego,* 191 F.3d 156, 166–168 (C.A.2 1999) (same); *United States v. Papajohn,* 212 F.3d 1112, 1118–1120 (C.A.8 2000) (grand jury testimony); *United States v. Thomas,* 30 Fed.Appx. 277, 279, 2002 WL 429383 (C.A.4 2002) (same); *Bintz, supra,* ¶¶ 15–22, 257 Wis.2d, at 188–191, 650 N.W.2d, at 918–920 (prior trial testimony); *State v. McNeill,* 140 N.C.App. 450, 457–460, 537 S.E.2d 518, 523–524 (2000) (same).

To add insult to injury, some of the courts that admit untested testimonial statements find reliability in the very factors that *make* the statements testimonial. As noted earlier, one court relied on the fact that the witness's statement was made to police while in custody on pending charges—the theory being that this made the statement more clearly against penal interest and thus more reliable. *Nowlin, supra,* at 335–338, 579 S.E.2d, at 371–372. Other courts routinely rely on the fact that a prior statement is given under oath in judicial proceedings. *E.g., Gallego, supra,* at 168 (plea allocution); *Papajohn, supra,* at 1120 (grand jury testimony). That inculpating statements are given in a testimonial setting is not an antidote to the confrontation problem, but rather the trigger that makes the Clause's demands most urgent. It is not enough to point out that most of the usual safeguards of the adversary process attend the statement, when the single safeguard missing is the one the Confrontation Clause demands.

*Crawford,* 124 S.Ct. at 1371–72. The *Crawford* Court concluded that "[w]here testimonial statements are at issue, the only indicium of reliability sufficient to satisfy constitutional demands is the one the Constitution actually prescribes: confrontation." *Id.* at 1374.[3]

▮▮▮▮▮ [¶ 19] There is no question that the hearsay statements of Newton were presented as testimonial evidence. *See Craw-*

*ford* at 1364 ("custodial examinations" and "[s]tatements taken by police officers in the course of interrogations are also testimonial") There is also no question that Vigil had no opportunity to confront Newton about these statements. Thus, the introduction of such hearsay was error. However, "[r]estrictions on the right to confront witnesses are subject to the harmless error analysis." *Van Riper v. State,* 882 P.2d 230, 237 (Wyo. 1994). Thus, it remains to be determined if the error was harmless:

> Generally, an error that violates a constitutional right of the accused is presumed to be prejudicial, unless the reviewing court is able to declare its belief that the error is harmless beyond a reasonable doubt. . . .
>
> On direct appeal, the State has the burden of proving that the constitutional errors below were harmless beyond a reasonable doubt. *Gentry v. State,* 806 P.2d 1269, 1272 (Wyo.1991). Because the State was without benefit of our *Asch [v. State,* 2003 WY 18, 62 P.3d 945 (2003)] opinion, its argument was limited to Daniel's failure to show prejudice; however, *Harlow* held that we have discretion to overlook the government's failure to argue harmlessness in an appropriate case. *Harlow,* ¶¶ 44–46. In deciding whether to exercise that discretion, a reviewing court may consider such factors as the length and complexity of the record, whether the harmlessness of the error is certain or debatable, and whether a reversal would result in protracted, costly, and futile proceedings in the trial court. *Id.*

*Daniel v. State,* 2003 WY 132, ¶¶ 15–16, 78 P.3d 205, ¶¶ 15–16 (2003).

[¶ 20] In its brief, the State simply argues that no error occurred and thus offers no analysis upon the question of whether any alleged error was harmless. Because the State has not argued that the introduction of the hearsay testimony was harmless, we could simply reverse and remand for a new

---

**3.** To the extent prior cases of this Court have followed the test enunciated in *Ohio v. Roberts,* 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980), to determine admissibility under the Confrontation Clause, those cases are overruled in

conformance with *Crawford. See, e.g. Robinson v. State,* 11 P.3d 361, 369–71 (Wyo.2000); *Johnson v. State,* 930 P.2d 358 (Wyo.1996); *Hopkinson v. State,* 632 P.2d 79, 127–37 (Wyo.1981).

trial. *See Cook v. McKune,* 323 F.3d 825, 840 (10th Cir.2003). However, this Court possesses a considerable degree of discretion in deciding sua sponte whether to engage in a harmless error analysis. The record in this case is not complex. This appeal involves only one criminal charge, and the trial lasted less than three days. A sua sponte harmless error analysis will be relatively simple. We will undertake this analysis, but only because neither party had the benefit of the United States Supreme Court decision in *Crawford* when this appeal was briefed or argued.[4]

[¶ 21] Our harmless error analysis must be set in the context of a violation of a constitutional right. We review claims of constitutional error under the standard developed in *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). "The *Chapman* standard requires the appellate court to be convinced beyond a reasonable doubt no reasonable possibility exists that the error contributed to the jury's determination. *Chapman,* 386 U.S. at 23–26, 87 S.Ct. at 827–29." *Harlow v. State,* 2003 WY 47, ¶ 47, 70 P.3d 179, ¶ 47 (Wyo.2003). Thus, upon review, this Court must be convinced beyond a reasonable doubt that the erroneous introduction of the hearsay statements of Newton did not contribute to the jury's guilty verdict.

[¶ 22] We have already determined that the admission of the hearsay statements of Newton violated Vigil's rights under the Confrontation Clause.

> The Confrontation Clause expresses a preference for face-to-face confrontation. *Ohio v. Roberts,* 448 U.S. at 63, 100 S.Ct. 2531. *Ohio v. Roberts* identified the components of a defendant's confrontation right as the interests in cross-examining the witness, in requiring the witness to testify under oath, in allowing the factfinder to view the witness's demeanor, and in requiring the witness to face the defendant as he tells his story. *Id.* at 63–64 & n. 6, 100 S.Ct. 2531. If the state is allowed to prove its case using a transcript of prior testimony, rather than live testimony, the

> defendant certainly loses the chance to have the factfinder view the witness's demeanor, and he may also lose the chance to make the witness face him as the witness testifies.

*Cook,* 323 F.3d at 832. All of these interests are implicated in the case sub judice.

[¶ 23] From the small amount of information Newton offered under oath at Vigil's trial we know that, at the time of the alleged assault, Newton was unemployed and living out of the back of his van. Newton admitted to possessing marijuana, and he and Victim were looking for a place to ingest the marijuana when they came across Vigil's shop. Newton and Vigil knew each other, and Newton said hello to Vigil. Almost all of this testimony was presented in response to leading questions after Newton answered "I don't know" or "I don't remember" to general questions. When asked if Newton and Victim entered Vigil's shop, Newton replied "I don't remember" and then invoked his Fifth Amendment right to remain silent.

[¶ 24] While the jury was given an opportunity to witness Newton's demeanor for this small portion of testimony, the members of the jury were not afforded the opportunity to hear Newton's version of the critical events from Newton himself. Vigil was denied the opportunity to cross-examine Newton. Instead, a polished police officer of over fifteen years experience presented Newton's hearsay statements of the critical events to the jury. We cannot say beyond a reasonable doubt that the lack of the opportunity to test Newton's credibility in front of the jury did not contribute to the jury's guilty verdict.

[¶ 25] Without Newton's hearsay statements, the only evidence presented against Vigil was the testimony of Victim. Victim admitted that she had been drinking and ingesting marijuana on the night in question. The State relied heavily on the hearsay statements of Newton to bolster Victim's testimony throughout its closing argument. Indeed, the State's theme in its closing argument could fairly be characterized as "two out of

---

4. We stress that, when harmless error is not asserted by the State, this Court will generally

treat such failure as a waiver.

the three people present in that shop principally agree with what happened." The State repeatedly referred to Newton's hearsay statements to support the testimony of Victim. Again, under the facts of this case, we are not convinced beyond a reasonable doubt that the admission of the hearsay statements did not contribute to the conviction of Vigil for aggravated assault and battery.

[¶ 26] Because of our disposition of this issue, we need not address Vigil's challenge to his denial of counsel at his preliminary hearing. While we have grave concerns about how Vigil's request for counsel at his preliminary hearing was handled, this issue is rendered moot by our grant of a new trial on other grounds.

## CONCLUSION

[¶ 27] The introduction at trial of the hearsay statements of Newton violated Vigil's constitutional right to confront the witnesses against him. Therefore, we reverse and remand for a new trial.