[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 170 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 171 
Charles Tinker was indicted for conspiracy to traffic in cocaine, a violation of § 13A-12-204, Ala. Code 1975 (count 1); attempted murder of Andre Thomas, a violation of §§ 13A-6-2 and13A-4-2, Ala. Code 1975 (count 2); two counts of capital murder — murder for hire in the killing of Jimmy "Tiger" Taylor and Ronald Thomas, violations of § 13A-5-40(a)(7), Ala. Code 1975 (counts 3 and 4); and trafficking in cannabis/marijuana, a violation of §13A-12-231, Ala. Code 1975 (count 5). The jury found Tinker guilty as charged in counts 2-5. With respect to count 1, the jury returned a verdict form indicating that it had found Tinker guilty of trafficking in cocaine. (See discussion in Part I.A. of this opinion.) Tinker was sentenced to life imprisonment without the possibility of parole on the two capital convictions and to life imprisonment on the three remaining convictions.
 I.
Tinker contends that the trial court improperly overruled his motion for a judgment of acquittal. Specifically, Tinker contends that the State did not present sufficient evidence to convict him of each of the charged offenses. (Issue IV in Tinker's appellate brief.)
"`In determining the sufficiency of the evidence to sustain a conviction, a reviewing court must accept as true all evidence introduced by the State, accord the State all legitimate inferences therefrom, and consider all evidence in a light most favorable to the prosecution.'" Ballenger v. State,720 So.2d 1033, 1034 (Ala.Crim.App. 1998), quoting Faircloth v. State,471 So.2d 485, 488 (Ala.Crim.App. 1984), aff'd, 471 So.2d 493
(Ala. 1985). "`The test used in determining the sufficiency of evidence to sustain a conviction is whether, viewing the evidence in the light most favorable to the prosecution, a rational finder of fact could have found the defendant guilty beyond a reasonable doubt.'" Nunn v. State, 697 So.2d 497, 498 (Ala.Crim.App. 1997), quoting O'Neal v. State, 602 So.2d 462, 464
(Ala.Crim.App. 1992). *Page 172 
"`When there is legal evidence from which the jury could, by fair inference, find the defendant guilty, the trial court should submit [the case] to the jury, and, in such a case, this court will not disturb the trial court's decision.'" Farrior v.State, 728 So.2d 691, 696 (Ala.Crim.App. 1998), quoting Ward v.State, 557 So.2d 848, 850 (Ala.Crim.App. 1990). "The role of appellate courts is not to say what the facts are. Our role . . . is to judge whether the evidence is legally sufficient to allow submission of an issue for decision [by] the jury." Ex parteBankston, 358 So.2d 1040, 1042 (Ala. 1978).
Any "inconsistencies and contradictions in the State's evidence, as well as [any] conflict between the State's evidence and that offered by the appellant, [goes] to the weight of the evidence and [creates a question] of fact to be resolved by the jury." Rowell v. State, 647 So.2d 67, 69-70 (Ala.Crim.App. 1994). "`"[T]he credibility of witnesses and the weight or probative force of testimony is for the jury to judge and determine."'" Johnson v. State, 555 So.2d 818, 820
(Ala.Crim.App. 1989), quoting Harris v. State, 513 So.2d 79, 81
(Ala.Crim.App. 1987), quoting in turn Byrd v. State,24 Ala.App. 451, 451, 136 So. 431, 431 (1931). "We have repeatedly held that it is not the province of this court to reweigh the evidence presented at trial." Johnson, 555 So.2d at 820. "`When the jury has passed on the credibility of evidence tending to establish the defendant's guilt, this Court cannot disturb its finding.'" Rowell, 647 So.2d at 69, quoting Collins v. State,412 So.2d 845, 846 (Ala.Crim.App. 1982). Furthermore, "`[t]his Court must view the evidence in the light most favorable to the State, and "draw all reasonable inferences and resolve all credibility choices in favor of the trier of fact."'" D.L. v.State, 625 So.2d 1201, 1204 (Ala.Crim.App. 1993), quotingWoodberry v. State, 497 So.2d 587, 590 (Ala.Crim.App. 1986). "Any issues regarding the weight and credibility of the evidence are not reviewable on appeal once the state has made a prima facie case." Jones v. State, 719 So.2d 249, 255 (Ala.Crim.App. 1996).
 A.
Tinker was charged with conspiracy to traffic in cocaine in count 1 of the indictment, which stated that Tinker
 "did between January 1994 and November 1999, agree with other persons including but not limited to David Phillips, Femark Dewayne Robinson, Edward Long and Glenis Latham to knowingly sell or deliver a quantity of cocaine, a controlled substance, in excess of 28 grams, and in furtherance of this conspiracy did attempt to kill Andra Thomas and hire the killing of Jimmy `Tiger' Taylor while within the Bessemer Division, Jefferson County, Alabama, said conduct occurring after July 23, 1987, in violation of Section 20-2-80 of the Code of Alabama, 1975."
(C. 2.) Tinker argues on appeal that the State did not make a prima facie case — that there was no corroboration of the testimony of his accomplices; that no cocaine was found or analyzed; that there was no evidence presented as to a conspiracy involving Andre Thomas;[1] that the conspiracy charge was based on speculation and hearsay; and that there was insufficient *Page 173 
evidence indicating a conspiracy or an overt act. Specifically, Tinker contends that "[e]ven though various people testified to dealing with [Tinker] in marijuana and cocaine, no independent evidence tended to connect [Tinker] with these transaction[s]." (Tinker's brief at p. 23.)
Our review of the record reveals that the following evidence was presented at trial regarding this charge: Edward Long testified that sometime "around 1988" he and Tinker began doing "drug deals" together and that Tinker was "the boss." (R. 339-40.) He stated that Tinker "would give [him] drugs and [he] would sell them and pay [Tinker] for [the drugs]." (R. 340.) Edward Long also testified that during and after January 1994, he, along with David Phillips and Femark Robinson, would get cocaine from Tinker and sell it and that the cocaine was housed at "Glenis Latham's place." (R. 348-49.)
Edward Long also testified that Andre Thomas had "been selling cocaine for Charles Tinker" (R. 354) and that in 1994 Andre Thomas owed Tinker approximately $2,800, and Andre Thomas "had started to dodge [Edward Long] because he wasn't going to pay the money." (R. 349.) He also testified that there had been "a couple [of] nights [when they had] assembled and rode out looking for [Andre], but [they] never found him" (R. 349) and then one morning, Tinker telephoned Edward Long and told him that "he had gotten him" at Charlie's Service Station on Dartmouth. (R. 353.)
Edward Long also testified that after Tinker shot Andre Thomas, Jimmy "Tiger" Taylor sent word to Tinker that Andre Thomas was his friend and that "it wasn't over" (R. 355), and Jimmy Taylor threatened to "snatch" Tinker's family. (R. 355.) Edward Long testified that this angered Tinker and he "assembled a party of people" to find and kill Jimmy Taylor. (R. 356.) When they received word that Jimmy Taylor was at a barbershop in Bessemer, they went to the barbershop and David Phillips and Femark Robinson killed Jimmy Taylor and were paid for their part in Jimmy Taylor's death. Edward Long's testimony was corroborated by that of Ronald Eaton, Corey Hall, Officer Paul Williams, and Det. William Byess.
Ronald Eaton, whose only connection with this case is that he was one of Tinker's cellmates at the Jefferson County jail, testified that Tinker had told him that Andre Thomas owed him some money and that when he saw Andre Thomas, he shot him. Ronald Eaton also testified that Tinker had told him that he had paid David Phillips and Femark Robinson to kill Jimmy Taylor.
Officer Paul Williams of the Bessemer Police Department testified that on May 26, 1994, he was dispatched to a shooting at a gasoline service station located at 2806 Dartmouth Avenue in Bessemer. Officer Williams testified that when he arrived at the scene, he found the victim lying just outside the first bay door on the southside of the service station, that the victim had sustained wounds to his head and his abdomen, and that the victim identified himself as Andre Thomas. Officer Williams stated that Andre Thomas told him that "Charles Tinker shot him." (R. 217.)
William Byess was a detective with the criminal division of the Bessemer Police Department in 1994 when Andre Thomas was shot, and he was the detective who was initially in charge of the investigation into Andre Thomas's shooting. Det. Byess testified that he knew that Andre Thomas was a drug trafficker in the Bessemer area and that during his investigation of Andre Thomas's shooting he learned that there was a drug connection between Andre Thomas and Tinker. *Page 174 
Corey Hall, Jimmy Taylor's half brother, testified that Jimmy Taylor was a drug dealer and an enforcer; that Jimmy Taylor dealt cocaine; and that Jimmy Taylor and Andre Thomas were friends. Corey Hall also testified that he was present when David Phillips entered the barbershop, placed a gun to Jimmy Taylor's head and began shooting, and that there was another man with David Phillips, but that he did not get a good look at the second man's face.
Section 12-21-222, Ala. Code 1975, provides:
 "A conviction of felony cannot be had on the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the commission of the offense, and such corroborative evidence, if it merely shows the commission of the offense or the circumstances thereof, is not sufficient."
It is well settled that the corroborating evidence need only be slight and can be circumstantial — it does not have to be strong enough by itself to warrant a conviction — but it must tend to connect the accused with the commission of the crime. See Arthurv. State, 711 So.2d 1031, 1059-60 (Ala.Crim.App. 1996).
As previously noted, Tinker was charged with conspiracy to traffic in cocaine. The indictment alleged that Tinker and othersagreed to sell cocaine. There were no factual allegations that Tinker actually trafficked in cocaine. Tinker's argument that there was no cocaine found or analyzed is without merit because the State did not have to prove trafficking, only conspiracy to traffic. Thus, it was not necessary that the State actually present any cocaine in support of the allegations in count 1 of the indictment.
Edward Long's testimony established the following: That Tinker and several others were involved in selling cocaine; that Andre Thomas was one of the individuals who sold cocaine for Tinker; that Andre Thomas owed Tinker $2,800 for the cocaine; that when it did not appear that Andre Thomas planned to pay Tinker the money he owed him, Tinker shot Andre Thomas; and that Tinker paid to have Jimmy Taylor killed when Jimmy Taylor threatened Tinker after Jimmy Taylor's friend, Andre Thomas, had been shot. Tinker's arguments — that there was no evidence presented as to a conspiracy involving Andre Thomas; that the conspiracy charge was based on speculation and hearsay; and that there was insufficient evidence indicating a conspiracy or overt act — are meritless in light of Edward Long's testimony.
Additionally, Tinker's argument that there was no corroboration of Edward Long's testimony is meritless. Ronald Eaton corroborated Edward Long's testimony when he testified that Tinker had told him that he shot Andre Thomas because Andre Thomas owed Tinker money and that Tinker said he paid David Phillips and Femark Robinson to kill Jimmy Taylor. Officer Williams corroborated Edward Long's testimony when he testified that when he responded to the scene of the shooting, the victim, Andre Thomas, told him that "Charles Tinker shot him." (R. 217.) Det. Byess corroborated Edward Long's testimony when he testified that he knew that Andre Thomas was a drug trafficker and he learned that there was a drug connection between Tinker and Andre Thomas. Corey Hall corroborated Edward Long's testimony when he testified that Jimmy Taylor dealt cocaine; that Andre Thomas and Jimmy Taylor were friends; and that he witnessed David Phillips enter the barbershop and shoot Jimmy Taylor. *Page 175 
In light of the foregoing, we conclude that there was sufficient evidence to support a conviction for conspiracy to traffic in cocaine — Tinker, Edward Long, Andre Thomas, and others were involved in the sale of cocaine, and both Tinker's attempt to kill Andre Thomas because Andre Thomas owed Tinker money for cocaine and the murder-for-hire of Jimmy Taylor were in furtherance of this conspiracy to traffic in cocaine.
Although we find that there was sufficient evidence indicating that Tinker conspired to traffic in cocaine, our review of the record reveals that this was not the crime for which he was convicted.
As previously noted, count 1 of the indictment charged Tinker with conspiracy to traffic in cocaine, stating that Tinker
 "did between January 1994 and November 1999, agree with other persons including but not limited to David Phillips, Femark Dewayne Robinson, Edward Long and Glenis Latham to knowingly sell or deliver a quantity of cocaine, a controlled substance, in excess of 28 grams, and in furtherance of this conspiracy did attempt to kill Andra [sic] Thomas and hire the killing of Jimmy `Tiger' Taylor while within the Bessemer Division, Jefferson County, Alabama, said conduct occurring after July 23, 1987, in violation of Section 20-2-80 of the Code of Alabama, 1975."
(C. 2.)
At trial, the trial court properly charged the jury on conspiracy to traffic in cocaine. The trial court's charge to the jury stated, in pertinent part:
 "The defendant is charged with criminal conspiracy. A person commits the crime of criminal conspiracy if with the intent that conduct constituting an offense be performed, he agrees with one or more persons to engage in or cause the performance of such conduct, and any one or more of such persons does an overt act to effect an objective of the agreement.
 "To convict, the State must prove beyond a reasonable doubt each of the following elements of criminal conspiracy: One, that the defendant Charles Tinker agreed with David Phillips, Femark Robinson, Edward Long, and Glenis Latham to engage [in] or cause to be performed conduct constituting the offense of trafficking cocaine — excuse me. That the defendant entered into the agreement with David Phillips, Femark Robinson, Edward Long, Glenis Latham with the intent that conduct constituting the offense of trafficking in cocaine would be engaged in or would be caused to be performed, and three, that the defendant or the co-conspirators did an overt act to affect an object of the agreement.
 "The person commits the crime of trafficking in cocaine if he knowingly either sells, manufactures, delivers, brings into the State or is in actual or constructive possession of cocaine in excess of 28 grams. If you find from the evidence that the State has proven beyond a reasonable doubt each of the above elements of the offense of conspiracy to traffic in cocaine, then you should find the defendant guilty of said offense.
 "If you find the State has failed to prove beyond a reasonable doubt each of the above elements of the offense of conspiracy to traffic in cocaine, then you should find the defendant not guilty of the offense."
(R. 964-65.)
However, the verdict form provided to the jury for count 1 stated:
 "We, the jury, find the defendant, Charles Tinker, guilty of trafficking cocaine, *Page 176 
as charged in count one of the indictment.
"_________
"FOREPERSON
"_________
"DATE
 "We, the jury, find the defendant, Charles Tinker, not guilty of trafficking cocaine, as charged in count one of the indictment.
"_________
"FOREPERSON
"_________
"DATE"
(C. 183, R. 975.) When the jury delivered its verdict, the foreperson of the jury stated:
 "Count one. We, the jury, find the defendant, Charles Tinker, guilty of trafficking cocaine, as charged in count one of the indictment."
(R. 986.) Thereafter, the trial court adjudged Tinker guilty of "trafficking cocaine" and sentenced him to life imprisonment for this conviction. (C. 230.)
Although the issue of the discrepancy between the offense charged in count 1 of the indictment and the verdict the jury returned on Count 1 was not raised on appeal, we will address this issue ex mero motu because it implicates the jurisdiction of the trial court to pronounce judgment on the verdict returned on count 1.
In Pittman v. State, 621 So.2d 351, 352 (Ala.Crim.App. 1992), Pittman was indicted for attempted murder, and "he was erroneously convicted of `intent to commit murder.'" The trial court had instructed the jury on "intent to commit murder" and "attempted murder" and "[t]he verdict form submitted to the jury contained a charge of `intent to commit murder' rather than `attempted murder.'" Pittman, 621 So.2d at 352. In reversing Pittman's conviction, this Court stated:
 "Although `intent' to commit a crime is a necessary element within any `attempt' statute, it is not, in and of itself, a crime to possess intent; hence, the court was without jurisdiction to pronounce judgment on the verdict finding the defendant guilty of `intent to commit murder.' Accordingly, the trial court's judgment on the `intent to commit murder' conviction is null and void and will not support an appeal."
Pittman, 621 So.2d at 352-53.
In Edwards v. State, 570 So.2d 252 (Ala.Crim.App. 1990), Edwards was indicted for unlawful sale of a controlled substance (marijuana), and the trial court instructed the jury on the offense of illegal sale of marijuana, but the verdict form submitted to the jury listed the offense as "possession of marijuana" and the jury returned a verdict finding Edwards guilty of "possession of marijuana." Edwards, 570 So.2d at 253. In reversing Edwards's conviction, this Court stated:
 "`The verdict in a criminal case must be responsive to the offense charged in the indictment, but surplusage can be disregarded if the intent of the jury is clear. A jury verdict will be held to be sufficient if its meaning can be reasonably ascertained from the words used. Where the error in the charge is in the form of the verdict and there is not prejudice to the rights of the accused the error is harmless.'
 "Peterson v. State, 508 S.W.2d 844, 849
(Tex.Cr.App. 1974). See also Rodgers v. State, 649 S.W.2d 371, 373-376 (Tex.App. 3 Dist. 1983).
 "In the present case, the jury's verdict was not responsive to the offense charged in the indictment and the jury's intent is not clear; therefore, the language *Page 177 
stating that the appellant was found guilty of the `possession of marijuana' cannot be held to be surplusage.
 "In State v. Whiting, 41 Ohio App.3d 107, 534
N.E.2d 904 (1987), the defendant argued on appeal that the jury verdict was insufficient to sustain his sentence for a second or third degree felony. The defendant in Whiting, supra, was indicted for aggravated trafficking, wherein the drug is a Schedule I or II controlled substance, but the jury verdict form stated that the defendant was guilty of simple trafficking in drugs, wherein the drug is a Schedule III, IV, or V controlled substance. The court found that `[t]he discrepancy between the indictment and the verdict form is sufficient to cast doubt upon the jury's verdict and create the need for a new trial because, under the facts of the case on review, trafficking in drugs cannot be a lesser-included offense of aggravated trafficking.'
"`As Chief Justice Marshall stated:
 "`"The rule that a man shall not be charged with one crime and convicted of another, may sometimes cover real guilt, but its observance is essential to the preservation of innocence. It is only a modification of this rule, that the accusation on which the prosecution is founded, should state the crime which is to be proved, and state such a crime as will justify the judgment to be pronounced."
 "`The Hoppet v. United States, 7 Cranch (11 U.S.) 389, 394, 3 L.Ed. 380, 382 (1813).'
 "Clements v. State, 370 So.2d 723, 728 (Ala. 1979), overruled, Beck v. State, 396 So.2d 645 (Ala. 1980). See also Ex parte Tomlin, 443 So.2d 59, 64-65 (Ala. 1983), cert. denied, 466 U.S. 954, 104 S.Ct. 2160, 80 L.Ed.2d 545 (1984), Johnson v. State, 399 So.2d 859, 865 (Ala.Cr.App. 1979), affirmed in part, reversed in part on other grounds, 399 So.2d 873 (Ala. 1979).
 "Because the appellant was charged with the unlawful sale of a controlled substance but was convicted, pursuant to the jury verdict forms, of the possession of marijuana, where the latter could not be a lesser included offense of the former, the judgment is due to be reversed and the cause remanded for a new trial."
Edwards, 570 So.2d at 253-54.
Here, although the trial court's charge to the jury properly contained an instruction regarding trafficking in cocaine in order to assist the jury in determining whether Tinker was guilty of conspiracy to traffic in cocaine, it is conceivable that a layperson on the jury could have easily construed the instructions as requiring the jury to determine whether Tinker was guilty of trafficking in cocaine, especially since the verdict form provided to the jury gave the jury two choices on count 1 — that the jury could find Tinker either guilty or not guilty of "trafficking cocaine, as charged in count one of the indictment." (C. 183, R. 975.) Thus, under the facts of this case, the jury's intent is unclear.
Moreover, trafficking in cocaine is not, under the circumstances in this case, a lesser-included offense of conspiracy to traffic in cocaine. Section 13A-12-205, Ala. Code 1975, "specifically designates criminal conspiracy as a lesser included offense of any controlled substance crime." Powell v.State, 596 So.2d 652, 654 (Ala.Crim.App. 1992). We recognize that in Scott v. State, 742 So.2d 799, 801 (Ala.Crim.App. 1998), this Court held that "nothing in [§ 13A-12-205] prohibits a substantive offense, under the appropriate facts, from being a lesser included offense of a conspiracy charge," and that the facts in Scott are very similar to the facts in the *Page 178 
present case. Scott was charged with conspiracy to distribute a controlled substance; the indictment was amended, by agreement, to charge unlawful distribution of a controlled substance; and Scott entered a guilty plea to unlawful distribution of cocaine. On appeal, this Court considered the question whether the offense of unlawful distribution of cocaine was encompassed by the charge contained in the original indictment — it was Scott's contention on appeal that "unlawful distribution of a controlled substance cannot be a lesser included offense of conspiracy to distribute a controlled substance." Scott, 742 So.2d at 800. In Scott,
this Court remanded the case for the trial court to determine whether unlawful distribution of a controlled substance was an included offense under the indictment or a separate offense.
However, we do not find it necessary to remand the present case for such a determination because under the current trend of recent Alabama decisions regarding whether one offense is included in another, it is clear that, under the facts of this case, the offense of trafficking in cocaine was not encompassed in the offense charged in count 1 of the indictment. In Johnsonv. State, 922 So.2d 137, 141 (Ala.Crim.App. 2005), this Court explained:
 "[I]n determining whether one offense is included in another, the trend of recent Alabama decisions is to focus on the statutory elements of the offenses and the factual allegations actually included in the indictment, rather than on the evidence or factual basis the State presents at trial or during the guilty-plea colloquy. See Ex parte Cole, 842 So.2d 605 (Ala. 2002); Wright v. State, 902 So.2d 720
(Ala.Crim.App.), aff'd, 902 So.2d 738 (Ala. 2004); Childers v. State, 899 So.2d 1023 (Ala.Crim.App. 2003), writ quashed, 899 So.2d 1025 (Ala. 2004); Bradley v. State, 925 So.2d 221 (Ala.Crim.App. 2004); and Toliver v. State, 881 So.2d 1070
(Ala.Crim.App. 2003)."
See also Moss v. State, 929 So.2d 486 (Ala.Crim.App. 2005).
Count 1 of the indictment alleged that Tinker and othersagreed to sell or deliver cocaine; however, the indictment doesnot contain any factual allegations that Tinker actuallytrafficked in cocaine. Therefore, we cannot conclude that the offense for which Tinker was convicted — trafficking in cocaine — was encompassed in the offense charged in count 1 of the indictment, and we have no alternative but to reverse Tinker's conviction under count 1 of the indictment. We note that Tinker's original indictment charging conspiracy to traffic in cocaine remains valid, and the State may try Tinker on this charge. SeeEx parte Cole, 842 So.2d 605, 609 (Ala. 2002).
 B.
Count 2 of the indictment stated that Tinker
 "did on or about May 20, 1994, with the intent to commit the crime of murder (Section 13A-6-2 of the Alabama Criminal Code) attempt to intentionally cause the death of another person, Andra [sic] Thomas, by committing an overt act towards the commission of the crime of murder, to-wit: by shooting him in the head and abdomen, in violation of Section 13A-4-2 of the Alabama Criminal Code."
(C. 2.) Tinker argues that there is insufficient evidence to sustain a conviction for attempted murder because, he says, the State failed to present a prima facie case; the State's case is based on speculation, conjecture, and hearsay; and although Andre told the police officer responding to the scene that "Charles Tinker shot him" (R. 217), the evidence at trial showed that there is another Charles Tinker. *Page 179 
Our review of the record reveals that the following evidence was presented at trial regarding the attempted-murder charge: Officer Williams testified that on May 26, 1994, he was dispatched to a shooting at a service station located at 2806 Dartmouth Avenue in Bessemer; that when he arrived at the scene, he found the victim lying just outside the first bay door on the southside of the service station; that the victim, who had sustained wounds to his head and his abdomen, identified himself as Andre Thomas; and that Andre Thomas told him that "Charles Tinker shot him." (R. 217.)
Tinker's attorney focused on the fact that the police report prepared by Officer Williams (Defendant's Exhibit 2) names a "Charles Cecil Tinker, Jr."[2] (R. 221) as the perpetrator, and the report contained a specific address, Social Security number, and physical description. Det. Byess, the detective who was initially in charge of this investigation, testified that "when Officer Williams radioed dispatch and asked them to run [the name Charles Tinker], that's what kicked up on the [National Crime Information Center computer]." (R. 256.) Det. Byess also stated that he "eliminated Charles Cecil Tinker [as a suspect] through photospreads and from the witness statements at . . . Charlie Smith's Garage." (R. 255.) Additionally, Det. Byess testified that during the course of his investigation, he learned that there was a history involving narcotics between Andre Thomas and Tinker, but that he did not have enough evidence at that time to allow him to go forward with the prosecution of Tinker.
Edward Long testified that "[o]n occasion" he had acted as an enforcer for Tinker and that an enforcer would make sure that the individuals who had received drugs paid Tinker for those drugs. (R. 345.) Edward Long stated that Andre Thomas had "been selling cocaine for Charles Tinker" (R. 354) and that in 1994 Andre Thomas owed Tinker approximately $2,800 and Andre Thomas "had started to dodge [Edward Long] because he wasn't going to pay the money." (R. 349.) Edward Long testified that there were "a couple [of] nights [when they] assembled and rode out looking for [Andre Thomas], but [they] never found him" (R. 349) and then one morning, Tinker telephoned Edward Long and told him that "he had gotten him" at Charlie's Service Station on Dartmouth. (R. 353.) Clearly, the evidence was sufficient to establish Tinker as the shooter.
Tinker further contends that Edward Long is the only witness that connected Tinker to Andre Thomas's shooting. We disagree. As previously noted, Andre Thomas told the police officer responding to the scene that Tinker had shot him. Additionally, Ronald Eaton testified that Tinker had told him that he had shot Andre Thomas because Andre Thomas owed him some money.
Based on the foregoing, we conclude that there was sufficient evidence to support Tinker's conviction for attempted murder.
 C.
Count 3 of the indictment stated that Tinker
 "did on or about MAY 31, 1994, intentionally cause the death of Jimmy `Tiger' Taylor, by shooting him to death, for *Page 180 
hire, to-wit: Charles Tinker hired David Phillips and Femark Robinson to kill Jimmy `Tiger' Taylor for a sum of money and cocaine, in violation of Section 23A-5-40(a)(7) [sic] of the Alabama Criminal Code."
(C. 2.) On appeal, Tinker argues that there was insufficient evidence — fingerprints or other physical evidence — to link him to this murder and that the only testimony at trial to connect him to this murder was given by Edward Long and there was nothing to corroborate Edward Long's testimony.
Edward Long testified at trial that after Andre Thomas was shot, Jimmy "Tiger" Taylor, who dealt cocaine with Andre Thomas, sent a message to Tinker that Andre Thomas was his friend and that "it wasn't over." (R. 355.) Jimmy Taylor's message to Tinker indicated that he had seen Tinker's family in the mall and that he could have "snatched" them. (R. 355.) Jimmy Taylor's threat made Tinker angry, so Tinker "assembled a party of people" — Edward Long, David Phillips, and Femark Robinson — and they "commenced to ride [around] looking for [Jimmy Taylor] to kill [him]." (R. 356-57.) Although they did not locate Jimmy Taylor the first night, they learned the next day that Jimmy Taylor could be found at a barbershop on the northside of Bessemer. As Edward Long approached the barbershop in his automobile, he saw an automobile being driven by Femark Robinson and that David Phillips was a passenger in that car. He testified that "they were in a hurry" (R. 363), and that as they passed by Edward Long's car, David Phillips gave Edward Long "a thumbs-up sign." (R. 364.) Thereafter, they met at Glenis Latham's body shop. Tinker told Femark Robinson and David Phillips to give their weapons to Glenis Latham and Tinker told Glenis Latham "to get rid of them." (R. 367.) Then Tinker pulled some money from his pocket and gave it to Femark Robinson and Tinker told David Phillips that "he would give it to him later." (R. 367-68.)
Edward Long's testimony was corroborated by that of Ronald Eaton, who testified at trial that Tinker told him that he had hired David Phillips and Femark Robinson to go to a barbershop and kill Jimmy "Tiger" Taylor and that after the shooting, they met at Glenis Latham's shop for payment, where Tinker gave Femark Robinson some money and two ounces of "dope," but that he did not pay David Phillips right then because Tinker and David Phillips were close and Tinker did not want Femark Robinson to know what David Phillips received for his part in the murder. (R. 787.)
Edward Long's testimony was also corroborated by Corey Hall, who testified that Jimmy Taylor dealt cocaine; that Andre Thomas and Jimmy Taylor were friends; and that he witnessed David Phillips enter the barbershop and shoot Jimmy Taylor.
Edward Long, an accomplice, testified regarding the details of the murder-for-hire scheme and his testimony was sufficiently corroborated by the testimony of Ronald Eaton and Corey Hall. SeeArthur, 711 So.2d at 1059-60. In light of the foregoing, we conclude that there was sufficient evidence presented to support Tinker's capital-murder conviction for the death of Jimmy "Tiger" Taylor.
 D.
Count 4 of the indictment stated that Tinker
 "did on or about JULY 14, 1996, intentionally cause the death of Ronald Thomas, by shooting him to death, for hire, to-wit: Charles Tinker hired Ben Lofton to kill Ronald Thomas for a sum of money, in violation of Section 23A-5-40(a)(7) *Page 181 
[sic] of the Alabama Criminal Code."
(C. 2.) Tinker argues on appeal that there was insufficient evidence — fingerprints or other physical evidence — to link him to this murder, that the only testimony at trial to connect him to this murder was given by Edward Long, and that there was nothing to corroborate Edward Long's testimony.
Edward Long testified at trial that Ronald Thomas was Andre Thomas's brother and that there was a time that Tinker hired Ben Lofton to rob Ronald Thomas, and Edward Long showed Ben Lofton where Ronald Thomas's house was located. However, when Tinker heard that Ronald Thomas was going to testify against him before a grand jury, he decided to have Ronald Thomas killed. Edward Long heard Tinker tell Ben Lofton that Tinker would pay Ben Lofton $5,000 if Ronald Thomas were dead. After Ronald Thomas was dead, Ben Lofton told Edward Long that Anthony Retic had posed as a police detective so that they could gain entrance to Ronald Thomas's house.
Belinda Thomas, Ronald Thomas's widow, testified that on July 14, 1996, a "detective" came to her front door around 12:00 midnight or 1:00 a.m. (R. 475.) She also testified that the "detective" had an accomplice and that this accomplice shot and killed Ronald Thomas.
Anthony Retic testified that his specialty was "home invasions" and that around 11:00 p.m. or 12:00 midnight on July 14, 1996, he posed as a police detective to gain entrance to Ronald Thomas's house. Anthony Retic stated that Ben Lofton approached him about being involved in this "home invasion" and that he did not know that Ben Lofton planned to kill Ronald Thomas during the robbery. Anthony Retic testified that after the incident occurred, Ben Lofton told him that "Charles was going to pay him" for killing Ronald Thomas (R. 520) and that Ben Lofton did not tell Anthony Retic beforehand that he was going there to commit murder because he did not think that Anthony Retic would have gone with him.
Gennorra Ridgel, an associate of Ben Lofton's, testified that he was with Ben Lofton when Edward Long showed them where a particular house was located in Bessemer and that when he saw Ben Lofton at a later date, Ben Lofton showed him his bulging pocket and told Gennorra Ridgel that "he [had] done it," that "little thing [he] was telling [Ridgel] about" when they were looking for that house. (R. 766.)
Ronald Eaton testified that Tinker told him that he had paid Ben Lofton to kill Ronald Thomas after Tinker had learned that Ronald Thomas had testified against him.
Edward Long's testimony regarding the details of the murder-for-hire scheme was sufficiently corroborated by the testimony of Belinda Thomas, Anthony Retic, Gennorra Ridgel, and Ronald Eaton. See Arthur, 711 So.2d at 1059-60. In light of the foregoing, we conclude that there was sufficient evidence presented to support Tinker's capital-murder conviction for the death of Ronald Thomas.
 E.
Count 5 of the indictment stated that Tinker
 "did on or about May 31, 1999, . . . knowingly manufacture, or bring into this state, or knowingly have in actual or constructive possession in excess of one kilo or 2.2 pounds but less than 100 pounds of cannabis, a controlled substance, to-wit: 14 pounds of cannabis and that such manufacturing, or bringing into this state or actual or constructive *Page 182 
possession took place subsequent to May 28, 1980, in violation of Section 13A-12-231 of the Code of Alabama, 1975."
(C. 2.) Tinker contends that although there was testimony indicating that Tinker dealt in marijuana, there was "no independent evidence [that] tended to connect [Tinker] with these transaction[s]" (Tinker's brief at p. 23); that the State did not have any marijuana or even a certificate of analysis from the Department of Forensic Sciences to show the jury; and that the State relied solely on the recital of facts in Tinker's federal plea agreement to support a conviction for trafficking in marijuana.
First, we note that Tinker does not argue that a double-jeopardy violation has occurred — that he could not be tried for the same offense in both federal and state court. SeeBarnett v. State, 373 So.2d 1226, 1227 (Ala.Crim.App. 1979) ("[A] prior conviction in federal court is no bar to a subsequent prosecution in State court for the same offense."); and Luke v.State, 373 So.2d 1228, 1229 (Ala.Crim.App. 1979) (same). See also Clemons v. State, 720 So.2d 961, 966-68 (Ala.Crim.App. 1996), for a discussion of the dual sovereignty doctrine.[3]
Instead, Tinker contends that "trafficking marijuana was not conclusively shown by the State" because, he says, "[t]here has been no marijuana recovered or tested" and "[t]he State depends on the recitation of facts in [Tinker's] federal court plea." (Tinker's brief at pp. 21-22.) Other than his argument before the trial court that State's Exhibit 30 (a certified copy of his federal conviction) was inadmissible because, he said, it was inadmissible character evidence pursuant to Rule 404(b), Ala. R.Evid., and that he admitted to distribution of marijuana in his federal plea, which, he argued, is not trafficking (see discussion in Part II.B. of this opinion), and his argument to this Court that State's Exhibit 30 was admitted in violation of the Confrontation Clause (see discussion in Part II.B. of this opinion), which he did not make to the trial court, Tinker does not challenge the admissibility of the recitation of facts in connection with the federal plea agreement.
It would appear that Tinker is arguing that the State failed to establish the corpus delicti of trafficking in cannabis/marijuana independent of the recitation of facts in his federal plea agreement. In Maxwell v. State, 828 So.2d 347 (Ala.Crim.App. 2000), this Court stated the following regarding the State's burden of proving the corpus delicti of a crime independent of an accused's confession:
 "It has been the rule in Alabama that the State must offer independent proof *Page 183 
of the corpus delicti of the charged offense to authorize the admission of a defendant's confession or inculpatory statement. Robinson v. State, 560 So.2d 1130, 1135-36 (Ala.Cr.App. 1989); see C. Gamble, McElroy's Alabama Evidence, 200.13 (5th ed. 1996). `"The corpus delicti consists of two elements: `(1) That a certain result has been produced, . . . and (2) that some person is criminally responsible for the act.'" Johnson [v. State, 473 So.2d 607, 608 (Ala.Cr.App. 1985),] (quoting C. Gamble, McElroy's Alabama Evidence § 304.01 (3d ed. 1977)).' Spear v. State, 508 So.2d 306, 308
(Ala.Cr.App. 1987). `"Positive, direct evidence of the corpus delicti is not indispensable to the admissions of confessions."' Bracewell v. State, 506 So.2d 354, 360 (Ala.Cr.App. 1986), quoting Ryan v. State, 100 Ala. 94, 14 So. 868 (1894). `The corpus delicti may be established by circumstantial evidence.' Sockwell v. State, 675 So.2d 4, 21
(Ala.Cr.App. 1993), aff'd, 675 So.2d 38 (Ala. 1995), cert. denied, 519 U.S. 838, 117 S.Ct. 115, 136 L.Ed.2d 67
(1996)."
Maxwell, 828 So.2d at 357. Additionally, this Court stated:
"Further, it is well settled that
 "`"inconclusive facts and circumstances tending prima facie to show the corpus delicti may be aided by the admissions or confession of the accused so as to satisfy the jury beyond a reasonable doubt, and so to support a conviction, although such facts and circumstances, standing alone, would not thus satisfy the jury of the existence of the corpus delicti."'
 "Bush [v. State], 695 So.2d [70,] 117-18 [(Ala.Crim.App. 1995), aff'd, 695 So.2d 138 (Ala. 1997)], quoting Bridges v. State, 284 Ala. 412, 417, 225 So.2d 821, 826 (1969); see also Bracewell, 506 So.2d at 360; Spear, 508 So.2d at 308. `While a confession is inadmissible as prima facie proof of the corpus delicti, it can be used along with other evidence to satisfy the jury of the existence of the corpus delicti.' Bracewell, supra at 360; see also Howell [v. State], 571 So.2d [396,] 397 [(Ala.Crim.App. 1990)]."
Maxwell, 828 So.2d at 357-58. See also Lewis v. State,889 So.2d 623, 675-76 (Ala.Crim.App. 2003).
In this case, we find that the State presented sufficient evidence to raise "`a reasonable inference of the existence of the corpus delicti of the charged crime'" — trafficking in cannabis/marijuana. Bush v. State, 695 So.2d 70, 117
(Ala.Crim.App. 1995), aff'd, 695 So.2d 138 (Ala. 1997), quoting C. Gamble, McElroy's Alabama Evidence § 304.01 (4th ed. 1991). Edward Long testified at trial that he sold drugs for Tinker on consignment. He stated that Tinker would give him drugs — specifically, cocaine and marijuana — and that he would sell the drugs and then pay Tinker. Edward Long also testified that they dealt with people outside the State of Alabama to obtain the marijuana and that there was an "FBI investigation" that resulted in both Tinker and Edward Long's being charged with conspiracy to distribute marijuana, but that no federal charges had been brought in connection with cocaine. (R. 341.)
The rule in Alabama is that while the uncorroborated testimony of an accomplice is not sufficient to support a felony conviction, the corpus delicti may be proved by the uncorroborated testimony of an accomplice. Stated differently, an accomplice's testimony requires no corroboration to be considered as evidence that a crime was committed by someone. See C. Gamble,McElroy's Alabama Evidence, § 300.01(4) (5th ed. 1996), citingSmith v. State, 59 Ala. 104 (1877). In Smith, the Alabama Supreme Court construed § 4895 *Page 184 
of the 1876 Code, the predecessor to § 12-21-222, as requiring corroboration of only that part of the accomplice's testimony that incriminates the defendant. The Court stated:
 "The evidence of the witness, Nicholson, [which consisted mainly of the defendant's confession,] did tend to connect the prisoner with the commission of the offence, and thus fairly presented to the jury the credibility of the accomplice. The statute does not specify any other fact, testified to by an accomplice, which requires corroboration before it will authorize conviction, and we are not authorized to add other clauses to it. The corroboration, extending to this essential, the question of guilt or innocence should be allowed to be passed on by the jury."
59 Ala. at 105 (emphasis added). See also Dykes v. State,30 Ala.App. 129, 1 So.2d 754 (1941). Therefore, we conclude that Edward Long's testimony, standing alone, was sufficient to establish the corpus delicti — that someone was bringing marijuana into this state and/or that someone was delivering and selling marijuana in this state. See Webster v. State,900 So.2d 460, 469 n. 8 (Ala.Crim.App.), rev'd on other grounds sub nom. Ex parte Stewart, 900 So.2d 475 (Ala. 2004).
Tinker admitted in the factual basis portion of his federal plea agreement that he had distributed approximately 64 pounds of marijuana. (State's Exhibit 30, "Plea Agreement and Conditions," p. 2.) In light of the foregoing, we conclude that there was sufficient evidence to support Tinker's conviction for trafficking in marijuana.
 II.
Tinker contends that the trial court improperly admitted State's Exhibits 28 and 29 (audiotape of Det. Michael Wood's February 7, 2001, interview of Femark Robinson and a transcript of Femark Robinson's recorded statement) and State's Exhibit 30 (a certified copy of Tinker's federal convictions) because, he says, the admission of those items into evidence was a violation of the Confrontation Clause and Crawford v. Washington,541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). (Issue I in Tinker's brief.)
 A.
Tinker argues that the admission of State's Exhibits 28 and 29 (Femark Robinson's recorded statement to authorities and the transcript of that statement) violated the Confrontation Clause and Crawford v. Washington. Specifically, he argues on appeal that when he was not given the opportunity to cross-examine Femark Robinson, he was not afforded his Sixth Amendment right to confront his accusers.
Before trial, the State subpoenaed Femark Robinson to testify as a witness for the prosecution. When Femark Robinson appeared at trial, the State granted him judicial immunity for whatever offenses he might testify to — "whether it's drug dealing, or crimes of violence, whatever it is." (R. 326). However, when the State began to question Femark Robinson about his relationship with Tinker, Femark Robinson invoked his Fifth Amendment rights and refused to testify. (R. 337.)
Michael Wood, a detective with the criminal investigation division of the Bessemer Police Department, testified at trial that he became the officer in charge of the investigation of these offenses when the federal government declined to prosecute these offenses and returned the files to the Bessemer Police Department.[4] Det. Wood *Page 185 
stated that shortly after he was placed in charge of the investigation, he received word that Edward Long wanted to speak with a representative from the Bessemer Police Department, so he reviewed the case file and met with Edward Long. Det. Wood testified that during this interview, Edward Long gave him the name of the second person involved in the shooting at the Bessemer barbershop that had resulted in the death of Jimmy "Tiger" Taylor. He said that Edward Long told him that the second shooter was an individual that Edward Long referred to as "Flemart." (R. 601.) Det. Wood stated that further investigation revealed that "Flemart" was Femark Robinson.[5]
Det. Wood testified that he and Lt. Ransom Miller interviewed Femark Robinson on February 7, 2001. During his direct examination, Det. Wood testified that while he did not discover any new physical evidence, he was able to obtain several indictments — David Phillips and Femark Robinson were indicted for the murder of Jimmy Taylor and the attempted murder of three other individuals who were in the barbershop when Jimmy Taylor was killed; Ben Lofton was indicted for the murder of Ronald Thomas; and Tinker was indicted on the charges that were the subject of the September 2004 trial and the present appeal — based upon the information received during the interviews with Edward Long and Femark Robinson. Although Det. Wood did not testify during direct examination as to any details regarding what was said during his interview with Femark Robinson, details regarding what was said during Det. Wood's interview with Femark Robinson began to emerge during Det. Wood's cross-examination. Specifically, Tinker's attorney questioned Det. Wood during cross-examination about why he interviewed Tony Carl Bennett — who had identified David Phillips as the first shooter and Edward Long as the second shooter in the barbershop shooting — on two different occasions in February 2001. The following exchange occurred during Tinker's cross-examination of Det. Wood:
 "[Tinker's attorney]: Why did you call [Tony Carl Bennett] back the second time?
 "[Det. Wood]: Because I had a confession from the second shooter.
"[Tinker's attorney]: Okay.
 "[Det. Wood]: And it puzzled me why Mr. Bennett identified Edward Long.
 "[Tinker's attorney]: Well, you didn't really have a confession, did you?
"[Det. Wood]: Yes, sir, I did have a confession.
 "[Tinker's attorney]: And that was the basis that brought Femark [Robinson] to trial, wasn't it, in effect?
"[Det. Wood]: His confession.
 "[Tinker's attorney]: Is that who you're talking about?
 "[Det. Wood]: Yes, sir. He confessed to being the second shooter." *Page 186 
(R. 647.) The following exchange also occurred during Det. Wood's cross-examination:
 "[Tinker's attorney]: Okay. And in that interview, either you or Miller said, `Femark Robinson,' paraphrasing, `we have got somebody identifying you to a tee at the barbershop killing, don't we,' in effect?
 "[Det. Wood]: I believe that was said during the actual interview.
"[Tinker's attorney]: Right.
"[Det. Wood]: Yes, sir.
"[Tinker's attorney]: But that wasn't true, was it?
 "[Det. Wood]: It was true to a point. There was a description. But actually identifying him, no. To say him, no.
 "[Tinker's attorney]: Okay. Please disagree with me if you disagree when somebody refers to `has got you to tee,' that's pretty darn exact, isn't it?
"[Det. Wood]: Yes, sir.
". . . .
 "[Tinker's attorney]: In other words, pretty darn sure. But that just wasn't true, was it?
"[Det. Wood]: No, sir.
 "[Tinker's attorney]: In fact, in that interview, and in that — in relation to that interview in Femark [Robinson's] trial, you admitted to deceiving him, didn't you?
"[Det. Wood]: I did, yes, sir."
(R. 627-28.) Additionally, during Det. Wood's cross-examination, Tinker's attorney read a portion of the questions that David Phillips's trial counsel had asked Det. Wood during cross-examination at David Phillips's trial:
 "[Tinker's attorney]: Okay. I'm going to read you right before that regarding Femark Robinson. His question. `All right. Let me ask you if you said this: "If you want me to take you as credible, I've got all these people saying one thing and you saying something totally different." That's your words, isn't it? That's your question to Femark.' Do you recall that?
 "[Det. Wood]: I think you're reading out of the transcript of the earlier [trial].
 "[Tinker's attorney]: Right. And the answer is, `Yes, sir'?
"[Det. Wood]: I assume it is.
 "[Tinker's attorney]: And question: `And he never did change his story. He kept saying he didn't go in.' Talking about Femark as to the barbershop. I will read that again. `And he never did change his story period. He kept saying he didn't go in, comma, didn't he?' Your answer, `Yes, sir'?
"[Det. Wood]: Right."
(R. 677-78.)
We find the following in the transcript of Femark Robinson's February 7, 2001, statement to Det. Wood:
 "Q. Let's get that straight. I'm not saying you shot a gun, OK? But, what I can show you right here is several people's statements. Said two people came to the door, OK?
"A. Well, I don't . . . I . . .
"Q. They described you to a `t.'
 "A. I would . . . I understand that. But, I . . . I didn't . . .
"Q. They say you come up to the door. OK?
"A. Yes, sir.
 "Q. Not on the side of the house, they say you come to the door.
"A. Yes, sir.
 "Q. If you want me to take you as credible . . . I got all these people saying one thing, and you're saying something totally different.
"A. Yes, sir." *Page 187 
(State's Exhibit 29, pp. 23-24.) Clearly Tinker's attorney was seeking during his cross-examination of Det. Wood to elicit details regarding what was said during Femark Robinson's statement in an attempt to discredit Femark Robinson's statement to Det. Wood. It was Tinker, not the State, who asked Det. Wood specific questions about what was said during Femark Robinson's recorded statement.
Prior to the State's redirect examination of Det. Wood, the following exchange occurred:
 "[Prosecutor]: Judge, in the taking of the statement from Femark Robinson at the Elmore facility, and they've been questioned — he's been questioned about specifics from that statement of Femark Robinson. Asked about statements that were made in Femark's statement as to whether or not he was credible or not. And it was quoted from Femark's statement.
 "Pursuant to the doctrine of completeness at this time, the State would like to proffer that after laying the proper foundation, the State will be offering into evidence State's Exhibit 28, which is a tape of that interrogation and the statement given by Femark Robinson on February 7th, 2001. And offering with that, the State will be offering State's Exhibit Number 29, after laying the proper foundation with this witness, which is a transcript of State's Exhibit Number 28.
 "[Tinker's attorney]: Your Honor, we are going to object. First, it is hearsay. We weren't able to cross-examine it. The defense never offered it into . . . evidence. The questions were if he recalled. As we all know some of this is a new issue as to Mr. Robinson are on appeal. But . . . the main thing is that it is hearsay, an out-of-court statement. The tape and the transcript — and that they [should] not be admitted.
"THE COURT: Anything further?
"[Prosecutor]: No, Your Honor.
"THE COURT: Overruled."
(R. 699-700.) When the State moved to admit State's Exhibit 28 and State's Exhibit 29, Tinker's attorney, once again, objected on the grounds that "[i]t's hearsay [and w]e couldn't cross-examine him." (R. 705.) The trial court overruled the objection, and State's Exhibit 28 was played for the jury and a transcript of this recorded statement was admitted into evidence.
We need not decide whether the trial court's admission of State's Exhibits 28 and 29 into evidence violated the Confrontation Clause and Crawford because, as the State points out in its brief:
 "When one party opens the door to otherwise inadmissible evidence, the doctrine of `curative admissibility' provides the opposing party with `the right to rebut such evidence with other illegal evidence.' McElroy's Alabama Evidence, § 14.01, p. 49 (5th ed. 1996). `[T]he law [is] that even though a party introduces evidence that may be immaterial or illegal, his opponent has the right to rebut such evidence and this right is unconditional.' Clark v. State, 54 Ala.App. 183, 186, 306 So.2d 51, 54
(1974). `"A party who has brought out evidence on a certain subject has no valid complaint as to the trial court's action in allowing his opponent or adversary to introduce evidence on the same subject."' Hubbard v. State, 471 So.2d 497, 499
(Ala.Crim.App. 1984) (quoting Brown v. State, 392 So.2d 1248, 1260 (Ala.Crim.App. 1980), cert. denied, 392 So.2d 1266 (Ala. 1981))."
Ex parte D.L.H., 806 So.2d 1190, 1193 (Ala. 2001). Thus, because Tinker opened the door as to the details of Femark Robinson's statement to Det. Wood, he cannot *Page 188 
now complain that the State's introduction of Femark Robinson's entire statement into evidence violated the Confrontation Clause and Crawford.
However, even if the admission of State's Exhibits 28 and 29 into evidence did violate the Confrontation Clause andCrawford, it would be harmless error.[6] Testimony that is inadmissible may be rendered harmless by prior or subsequent lawful testimony to the same effect or from which the same facts can be inferred. McFarley v. State, 608 So.2d 430, 433
(Ala.Crim.App. 1992). "The erroneous admission of evidence that is merely cumulative is harmless error." Dawson v. State,675 So.2d 897, 900 (Ala.Crim.App. 1995).
In his statement to Det. Wood, Femark Robinson stated that he had had a conversation with Tinker about him and David Phillips going to a barbershop and shooting a guy who would be at the barbershop in order to make a little money; that he and David Phillips drove to a barbershop in Bessemer; that each of them had a gun; that David Phillips, who was walking ahead of him, entered the barbershop and fired 10 or more shots with an automatic weapon; that he "freaked out" (State's Exhibit 29, p. 10) and ran back to the car; and that after they left the barbershop, they met with Tinker, who gave him "about $2,500" in cash (State's Exhibit 29, p. 16) and two to two and one-half ounces of "dope." (State's Exhibit 29, p. 11.)
Edward Long testified that after Tinker shot Andre Thomas, Jimmy Taylor sent word to Tinker that "it wasn't over" (R. 355), and Jimmy Taylor threatened to "snatch" Tinker's family. (R. 355.) This made Tinker mad, and Tinker "assembled a party of people" (R. 356) — Edward Long, David Phillips, and Femark Robinson — who began to look for Jimmy Taylor in order to kill him. After Jimmy Taylor was killed at the barbershop, they met at Glenis Latham's body shop and Tinker gave Femark Robinson some money and told David Phillips that "he would give it to him later." (R. 367-68.)
Ronald Eaton, whose only connection to this case is that he was one of Tinker's cellmates from the Jefferson County jail, testified that Tinker had told him that he had paid David Phillips and Femark Robinson to go to a barbershop and kill Jimmy "Tiger" Taylor and that after David Phillips and Femark Robinson killed Jimmy Taylor in a barbershop, they met Tinker at Glenis Latham's shop and Tinker gave Femark Robinson some money and two ounces of "dope," but that Tinker did not pay David Phillips in front of Femark Robinson because, as Tinker told Ronald Eaton, Tinker and David Phillips were close and Tinker did not want Femark Robinson to know what he had given David Phillips for his part in killing Jimmy Taylor. (R. 787.)
Corey Hall is a barber who was cutting a young boy's hair at the barbershop in Bessemer where the shooting occurred on the afternoon of May 31, 1994, when he witnessed Jimmy Taylor being shot. Corey Hall testified that David Phillips entered the barbershop, placed a gun to Jimmy Taylor's head, and began shooting. Corey Hall stated that there was another man with David Phillips, but that he did not get a good look at the second man's face and he did not see the second man shoot a gun.
Thus, if the admission of State's Exhibits 28 and 29 was error, it was harmless *Page 189 
error because it was merely cumulative of other evidence presented during the trial.
 B.
Tinker also contends that the admission of State's Exhibit 30 (a certified copy of Tinker's federal convictions) is a violation of the Confrontation Clause and Crawford v. Washington,541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177. Specifically, Tinker contends that he "was not able to cross-examine . . . the person or persons who put the facts in the federal court plea." (Tinker's brief at p. 10.) However, that was not the objection Tinker raised at trial.
When the State offered State's Exhibit 30 at trial, Tinker's attorney stated that his objection was based on Rule 404(b), Ala.R.Evid. — he argued that evidence of Tinker's federal convictions was inadmissible because "[s]uch acts are a form of character evidence." (R. 715.) Tinker's attorney also pointed out that in the factual basis for Tinker's guilty plea to the federal charges Tinker admitted to distribution of marijuana and that "count five in the State government's indictment is trafficking, which is not distribution." (R. 716.)
"The statement of specific grounds of objection waives all grounds not specified, and the trial court will not be put in error on grounds not assigned at trial." Ex parte Frith,526 So.2d 880, 882 (Ala. 1987). Thus, this issue is not properly before this Court for review.
 III.
Tinker argues that the trial court improperly denied hisBatson[7] motion. (Issue II in Tinker's brief.) After the jury was struck, Tinker's attorney challenged four jurors. Tinker alleged that the jury pool consisted of 48 veniremembers, that 16 of the 48 veniremembers were black, and that the State struck 11 of the 16 blacks. It was the defense's contention that a disproportionate number of black veniremembers were struck and that the only reason these four jurors were struck was because they were black and had been victims of crime. Tinker contends that he made out a prima facie case of discrimination and that the State should have been required to give the reasons for its strikes. However, Tinker did not articulate how the State's strikes of these four jurors revealed discriminatory intent on the State's part. He did not offer any evidence indicating that the State did not strike white jurors who were victims of crime, which would have created an inference that the State was engaging in a possible discriminatory motive in striking these four black jurors. In Moss v. State, 834 So.2d 135, 142-43 (Ala.Crim.App. 2002), this Court stated:
 "While it is true the striking of one person for a racial reason is a violation of the principles of Batson, and grounds for reversal, see Williams v. State, 548 So.2d 501, 507 (Ala.Crim.App. 1988), it is equally true that `[m]erely showing that the challenged party struck one or more members of a particular race is not sufficient to establish a prima facie case.' Edwards [v. State], 628 So.2d [1021,] 1024 [(Ala.Crim.App. 1993)]. See also Ex parte Trawick, 698 So.2d 162 (Ala. 1997) (holding that without more, the mere fact that the prosecutor used a high number of strikes to remove women from the venire is insufficient to establish a prima facie case).
 "`A defendant fails to establish a prima facie case of discrimination under Batson and Ex parte Branch, *Page 190 526 So.2d 609 (Ala. 1987), where the defendant fails to show any evidence of discrimination other than the number of African-American veniremembers who were struck. Young v. State, 730 So.2d 1251, 1253-54
(Ala.Cr.App. 1998); Moore v. State, 677 So.2d [828,] 829 [(Ala.Crim.App. 1996)]. "`It is within the sound discretion of the trial court to determine if the State's peremptory challenges of black jurors are motivated by intentional racial discrimination.'" Taylor v. State, 666 So.2d 36, 43 (Ala.Cr.App. 1994), aff'd, 666 So.2d 73 (Ala. 1995), cert. denied, 516 U.S. 1120, 116 S.Ct. 928, 133 L.Ed.2d 856 (1996), quoting Ex parte Lynn, 543 So.2d 709, 712 (Ala. 1988), cert. denied, 493 U.S. 945, 110 S.Ct. 351, 107 L.Ed.2d 338 (1989). "A circuit court's ruling on a Batson objection is entitled to great deference, and we will reverse a circuit court's Batson
findings only if they are clearly erroneous." Stokes v. State, 648 So.2d 1179, 1181 (Ala.Cr.App. 1994) (citations omitted).'
 "Powell v. State, 796 So.2d 404, 431
(Ala.Crim.App. 1999), aff'd 796 So.2d 434 (Ala. 2001)."
The trial court did not abuse its discretion when it denied Tinker's Batson challenge to four black jurors.
 IV.
Tinker also contends that counts 3 and 4 of the indictment should have been dismissed because, he says, the Code section listed in Counts 3 and 4 of the indictment — § 23A-5-40(a)(7) — is nonexistent and that when the trial court allowed the State to amend the indictment to state the correct Code section — §13A-5-40(a)(7) — a new offense was charged. (Issue III in Tinker's brief.)
In his motion to dismiss counts 3 and 4 of the indictment, Tinker argued that he was prejudiced because the State was attempting to deprive him of his liberty, and perhaps his life, under an indictment that cited a nonexistent Code section. (C. 141-42.) At the pretrial hearing on this motion, Tinker stated that he was "prejudiced here because count three and four are the capital-murder charges" and that "as soon as we discovered [that these counts cited a nonexistent Code section], we filed this motion." (R. 65-66.) The State argued at the pretrial hearing that Tinker "knows what he is charged with" because it is "[o]bvious in the indictment [that] he's charged with murder-for-hire on both these capital-murder counts" even though the State had "miscited a Code section, cited 23 instead of 13" in counts 3 and 4. (R. 66-67.) The State requested that the trial court correct the indictment and move forward. The trial court granted the State's request to amend the Code section cited in counts 3 and 4 to read § 13A-5-40(a)(7) instead of § 23A-5-40(a)(7).
"Miscitation of a code section does not void an indictment which otherwise states an offense; and, in the absence of a showing of actual prejudice to the defendant, reference to the erroneous code section will be treated as mere surplusage." Exparte Bush, 431 So.2d 563, 564 (Ala. 1983).
It is clear from the statement made by Tinker's attorney at the hearing that Tinker knew that he had been charged with capital murder. Counts 3 and 4 of the indictment clearly charged Tinker with murder-for-hire. Thus, Tinker was not prejudiced when the trial court allowed counts 3 and 4 of the indictment to be amended to reflect the correct Code section. *Page 191 
 V.
Based on the foregoing, we affirm Tinker's convictions and sentences for attempted murder as to Andre Thomas (count 2), trafficking in cannabis/marijuana (count 5), and capital murder for the killing of Jimmy "Tiger" Taylor and Ronald Thomas (counts 3 and 4). However, we reverse Tinker's conviction under count 1 and remand the case to the trial court for further proceedings as to that count consistent with this opinion.
Additionally, we note that although Tinker was convicted of trafficking in cannabis/marijuana (count 5), the trial court failed to impose the fine mandated in § 13A-12-231(1)(a), Ala. Code 1975, or to assess the additional penalties mandated by §§ 13A-12-281 and 36-18-7(a), Ala. Code 1975. (See R. 1025-26, C. 229-30.) On remand, the trial court is directed to take such action as may be necessary to see that the mandatory penalties prescribed in §§ 13A-12-231(1)(a), 13A-12-281, and 36-18-7(a) are imposed. Due return shall be filed with this Court no later than 28 days from the date of this opinion.
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED WITH DIRECTIONS.*
McMILLAN, P.J., and COBB, BASCHAB, and WISE, JJ., concur.
[1] Although the indictment spells the victim's name in Counts 1 and 2 as "Andra Thomas" (C. 2), the police report of June 27, 1994 — which is a supplement to case number 052640822, the police report prepared on May 26, 1994 (State's Exhibit 1 and Defendant's Exhibit 1) — spells his name as "Andre Thomas." Additionally, we note that he signed his name on the June 27, 1994, police report as "Andre Thomas."
[2] Tinker is "Charles L. Tinker" and his middle name is "Lakeith." (C. 259-60; State's Exhibit 30.) Edward Long testified at trial that he did not know a "Charles Cecil Tinker" (R. 364) and that the man sitting in the courtroom was the only "Charles Tinker" he knew. (R. 364-65.)
[3] This Court's reversal of the convictions in Barnett,373 So.2d 1226, and Luke, 373 So.2d 1228, was controlled by §20-2-77, Ala. Code 1975, which stated:
 "If a violation of this chapter [the Alabama Uniform Controlled Substances Act] is a violation of a federal law or the law of another state, a conviction or acquittal under federal law or the law of another state for the same act is a bar to prosecution in this state."
However, § 20-2-77 was repealed by Act No. 87-603, § 12, Ala. Acts 1987, effective October 21, 1987. In Clemons, this Court noted that Wisconsin had a statute that stated:
 "`Bar to prosecution: If a violation of this chapter is a violation of a federal law or the law of another state, a conviction or acquittal under federal law or the law of another state for the same act is a bar to prosecution in this state.'
"Wis. Stat. § 161.45."
720 So.2d at 968. This Court further noted that this "Wisconsin statute . . . limited dual prosecutions by state and federal authorities" and it stated that "[i]f the legislature of this state had intended to limit dual prosecutions by federal and state courts it could have enacted a statute similar to the Wisconsin statute." Clemons, 720 So.2d at 968.
[4] Det. Wood testified that "the FBI had originally taken over all these Bessemer cases" (R. 595) and that when it was decided that the murders would not be part of the federal prosecution, the files were returned to the Bessemer Police Department. Det. Wood stated that in either December 2000 or January 2001 he was present at a meeting between officials from Bessemer and representatives from the FBI and the United States Attorney's Office concerning these cases. (R. 609-10, 612.)
[5] Det. Wood testified that when he learned that "Flemart" could possibly be Femark Robinson, he pulled a photograph of Robinson and faxed it to the facility where Long was being housed and that Long confirmed that the photograph "was the person he was talking about." (R. 602.)
[6] "[V]iolations of the Confrontation Clause are subject to harmless-error analysis." Smith v. State, 898 So.2d 907, 917
(Ala.Crim.App. 2004). See also Perkins v. State,897 So.2d 457, 465 (Ala.Crim.App. 2004).
[7] Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712,90 L.Ed.2d 69 (1986).
* Note from the reporter of decisions: On September 16, 2005, on return to remand, the Court of Criminal Appeals affirmed, without opinion. On October 21, 2005, that court denied rehearing, without opinion. On December 9, 2005, the Supreme Court denied certiorari review, without opinion (1050193). *Page 883