STATE of Minnesota, Respondent,

v.

Jeremy Jason HULL, Appellant.

No. A09–220.

Supreme Court of Minnesota.

Sept. 9, 2010.

Lori Swanson, Attorney General, Kimberly R. Parker, Assistant Attorney General, St. Paul, MN; and Jan Kolb, Mille Lacs County Attorney, Milaca, MN, for respondent.

Jodie L. Carlson, Assistant State Public Defender, St. Paul, MN, for appellant.

## OPINION

ANDERSON, PAUL H., Justice.

Lewis Wilczek disappeared after attending a family barbeque in Little Falls on April 29, 2007. Six days later, the police found Wilczek's body buried in a gravel pit. A Mille Lacs County grand jury subsequently indicted Jeremy Jason Hull for one count of first-degree premeditated murder, in violation of Minn.Stat. § 609.185(a)(1) (2008), and one count of first-degree intentional murder while committing aggravated robbery, in violation of Minn.Stat. § 609.185(a)(3) (2008), for causing Wilczek's death. After a jury trial, Hull was found guilty of both counts. Conviction was entered on the first-degree premeditated murder count, and Hull received a sentence of life in prison without the possibility of parole. He now appeals his conviction. Hull argues that two out-of-court statements made by Wilczek before his death, one to a friend and another to a police officer investigating a theft, were admitted in violation of the Confrontation Clause. He further argues that a complete hearing should have been conducted on the admissibility of expert testimony on the subjects of fingerprint and

handwriting analysis. Hull also raises several arguments in a pro se supplemental brief. We affirm.

We draw our account of the events leading up to and following Lewis Wilczek's murder from the testimony and physical evidence presented by the State at appellant Jeremy Jason Hull's trial. Several relatives of both Hull and Wilczek testified at the trial, along with several law enforcement officers and forensic scientists. Important testimony was also provided by Hull's girlfriend, Casey Jo Oldenburg.

Hull and Wilczek were acquaintances who shared a common interest in cars and trucks. Wilczek worked for his family's business delivering firewood to restaurants. He also owned an auto-repair business called Performance Exhaust, which was located on his parents' land in Little Falls, Minnesota. Wilczek lived in an apartment above his auto-repair business. During the summer of 2006, Hull lived with Oldenburg in St. Cloud and spent time helping Wilczek with firewood deliveries and in the auto-repair business. At this time, several warrants had been issued for Hull's arrest because of theft and driving offenses. Wilczek gave Hull rides to the auto shop because Hull did not have a valid driver's license.

In August 2006, Hull brought his black Ford Mustang to Wilczek's auto shop for repairs. Wilczek and Hull worked on the car but were unable to fix it, so Wilczek brought the car to another shop and billed the repairs to the Wilczek family's account. Hull picked up the car when the repairs were completed. At the time of Wilczek's death, which occurred eight months later, Hull still owed Wilczek money for the repairs to the car.

A second vehicle-related transaction between Hull and Wilczek involved an older green Ford pickup truck. Wilczek sold the truck to Hull during the summer of 2006, and Hull agreed to work for Wilczek in order to pay for part of the purchase price. At Hull's request, Hull's sister put the title of the truck in her name. Wilczek and Hull performed repair work on the truck during the summer, but Hull failed to make payments toward the truck's purchase price.

At some point during the summer of 2006, Hull was stopped by the police for driving the truck while it had a broken taillight. During the stop, Hull ran from the police. The truck was then impounded. At Wilczek's request, Hull's sister subsequently transferred the title to the truck to Wilczek, so Wilczek could retrieve the truck from the police.

On the night of September 29, 2006, Hull and Oldenburg went to Wilczek's property to take the truck back from Wilczek. Wilczek called the sheriff's office and stated that Hull may have taken the truck, and that Hull did not own the truck and had not paid for it. A deputy sheriff on patrol located Hull driving the truck and pulled him over. Hull identified himself using the name of a friend and gave a false birth date. After processing this identification information on the computer, the deputy was informed by the dispatch center that no such person had a driver's license in Minnesota. The deputy then instructed another officer to run a search for Jeremy Hull—the name given by Wilczek—in hopes of finding a photo. After overhearing the discussion about that search, Hull got out of the truck and ran away from the scene of the stop. The deputy sent his dog to apprehend Hull, but Hull crossed a barbed wire fence and the dog got caught up in the fence, so Hull was able to escape arrest.

As a result of the two incidents with the police, Hull and Oldenburg moved from their St. Cloud apartment to the home of a

friend in Paynesville, Minnesota. In February 2007, while the couple lived in Paynesville, Hull attempted to get a birth certificate using another false name. Oldenburg stated that Hull wanted to "start clean" with a different name because of the outstanding warrants for his arrest. Hull and Oldenburg went to the Meeker County Courthouse to get the birth certificate but failed in their attempt to do so because the registrar found a record showing that the person whose name Hull used was deceased. Following this failed attempt to obtain a false birth certificate, the police went to the Paynesville residence to question Hull about the incident and confiscated his computer and his wallet.

After the police visit, Hull and Oldenburg left their friend's home in Paynesville and stayed at a hotel for a week. They next moved in with a relative of Hull's. Hull had previously given the last name of that relative as his own last name. In April 2007, Hull and Oldenburg moved into a new apartment in St. Cloud. Hull again used a false name—this time that of his cousin—to enter into the lease.

During this time period, Hull frequently wrote personal notes to himself and to Oldenburg in spiral notebooks. He wrote about feeling lonely and depressed and about contemplating suicide because his life was so bad. During the time Hull and Oldenburg lived in Paynesville, Hull wrote the following note describing his plan to fix his life:

> Well I think I might have finally figured something out. I'm kinda screwed though cuz I need a computer and I need cash. I hope and pray that Casey can afford to help me yet again.
>
> *(PLAN)*
>
> -make fake Birth Certificate
> -go to Wisconson [sic] or Montana to get State ID

> -The [sic] go to Social Security office to hope to get new number
> -Then use the SS# and State ID to go through Drivers training
> -Get NEW Life

Later, after Hull and Oldenburg moved back to 'St. Cloud, Hull stole a computer from the relative's home where they had recently been staying.

Sometime in April 2007, Hull made another entry in his notebook revising his plan to get a new life. He wrote to Oldenburg:

> Don't hate me for this. This is my plan to have a good happy life again. I hope you will understand. I want to go up to lewis around 11 pm and walk in to his place while he is sleeping. Stab him a couple times. Then pack up alot [sic] of his stuff and leave. Basically make it look like he moved. I will the [sic] bury him and his bed. Take as much stuff as I can get and be outta his place by 1 am! I'd take down the sign's out side and type up some signs for the door that say out of business. Maybe write a letter saying he meet [sic] a girl in Cali. and that he is sick of all the bs. Then the next day put all the stuff in a storage shed.

Several partial sentences follow that part of the notebook entry, but the sentences are not complete because the bottom right corner of the page was torn before the police acquired the notebook. The partial continuation of the note reads: "get a p.o. box and hav . . . his mail set [sic] to the p.o. box. Shut . . . and phone. Change his name to . . . want. and there it is . . . .picked up and left! . . . have enough money . . . ."

After reading the note, Oldenburg told Hull that he was crazy. Oldenburg said that Hull responded that "nothing could go wrong." Evidence showed that Hull be-

gan executing his plan in the days leading up to Wilczek's death, which occurred on April 29, 2007. On April 24, Hull visited a website that included a list of Ford vehicles that Wilczek owned. On April 25, Hull conducted a number of searches for "Wells Fargo Bank." On April 27, someone identifying himself as Wilczek called Wells Fargo to set up an appointment for April 30. Also on April 27, someone called Wilczek from Hull's apartment. And sometime in the days before April 29, Oldenburg said Hull told her that he rode a bicycle from St. Cloud to Little Falls—a distance of about 36 miles—and "scoped out" Wilczek's auto shop.

Wilczek spent the afternoon of April 29, a Sunday, at a barbeque at his mother's house in Little Falls. While at the barbeque, Wilczek told his mother that he was going to St. Cloud to meet Hull, so that Hull could pay a debt that he owed to Wilczek. Wilczek also told his friend J.B. that he was going to St. Cloud to collect $2,500 from Hull. Wilczek told J.B. that if Wilczek was not back from St. Cloud by 6:00 p.m., "somethin[g] was probably wrong." At about 5:00 p.m., Wilczek called his cousin and asked for directions to a St. Cloud destination. At 6:00 p.m., Wilczek called his cousin again to let him know that he had located Hull for their meeting. Later that evening, J.B. tried calling Wilczek, but got no answer.

Oldenburg spent most of April 29 attending a birthday party, working at her parents' home, and shopping at a St. Cloud grocery store. She testified that shortly after she returned to the apartment that evening, Hull came in with their dog and told her that he had succeeded in getting a new life and that everything would now be okay for them. Hull told Oldenburg that he had ridden his bicycle to Wilczek's shop, strangled him, and returned to St. Cloud in Wilczek's truck with Wilczek's body in the back of the truck. Hull said that he used a dog leash and "pulled so tight that it made his fingers fall asleep." Oldenburg did not believe Hull, so he took her outside to show her Wilczek's pickup truck parked near their apartment, and what appeared to be a rolled-up mat in the bed of the truck. The two then went back into the apartment, where Hull proceeded to review various documents belonging to Wilczek, including titles to vehicles, bank statements, and checks.

The following morning, April 30, Wilczek's friend J.B. went to Wilczek's shop looking for him. He found a handwritten note on the door, but concluded that it was not written in Wilczek's handwriting. The note read: "I HAD TO GO out of town. Sorry for the timing Lewis." The friend gave the note to the police.

On April 30, Oldenburg went to work before 7:00 a.m. as usual. At 7:01 a.m., a PayPal account was opened in Wilczek's name on the computer in Hull's apartment. At 7:22 a.m., a call was made from Hull and Oldenburg's apartment to the St. Francis Credit Union, where Wilczek banked. At 10:00 a.m., that same morning, Hull went to the Wells Fargo bank for the appointment with a bank representative that had been scheduled in the name of Lewis Wilczek a few days earlier. While at the bank, Hull set up two certificates of deposit—one to be used as collateral for a motorcycle loan—and opened a checking account and a savings account in Wilczek's name. The checking account was later added to the PayPal account opened earlier in the day. Hull deposited a total of $46,000 using a check drawn on an account at the St. Francis Credit Union.

Later that afternoon, Hull purchased a cell phone in Wilczek's name. Hull also went to a Harley–Davidson store, where he bought a new motorcycle, two leather

jackets, two vests, a leather cap, and a set of chaps. He paid for the motorcycle with a Wells Fargo Bank check and for the clothing using one of Wilczek's checks. That same day, Hull also used one of Wilczek's checks to purchase insurance for both the new motorcycle and a Ford pick-up truck.

In phone calls to Oldenburg on April 30, Hull discussed his need to get rid of Wilczek's body. At 7:53 p.m., Oldenburg sent Hull a text message that read "U got something to dig?" Hull wrote back, "Not yet." Hull then met Oldenburg at their apartment and they went to a Target store, where Hull purchased two shovels at approximately 8:30 p.m. After buying the shovels, they went to the Harley–Davidson store to pick up Wilczek's truck, which Hull had left behind when he drove the new motorcycle home. Next they went to a gas station and a sub shop where they purchased a one-gallon container of diesel fuel and some sandwiches. Then they drove to a gravel pit located on a tract of rural property where Hull had once lived.

At the gravel pit, Hull dug a hole about two feet deep. He then unrolled the mat that was in the back of the truck, and Oldenburg saw a blue plaid blanket that had been on their bed wrapped around what later proved to be Wilczek's body. Hull put the blanket-wrapped body into the hole, covered it with diesel fuel, and lit it on fire. Oldenburg testified that the fire burned for "[a] long, long time" and that Wilczek's body was not recognizable because of the burning. She stated, however, that she knew it was Wilczek's body because she saw a fox tattoo that she knew Wilczek had on his shoulder. During the burning, Hull made further attempts to destroy Wilczek's body by hitting and chopping it with a shovel.

Oldenburg stated that Hull referred to the jeans he was wearing that night as his "anniversary pants," "[t]o avenge his past" because "they were the pants that he wore the night that Lewis [Wilczek] called the cops on him." The jeans had been torn on a barbed-wire fence the night he took Wilczek's truck and ran from the police.

In the early morning hours of May 1, Hull and Oldenburg left the gravel pit. Oldenburg testified that the body was "[s]till very much there" when they left. She said Hull covered the body with dirt and then drove over it with the truck. They then drove back to their apartment and went to bed.

Hull rented a Bobcat skid loader and trailer during the morning of May 1 for the purpose of burying Wilczek's body deeper. At about 9:00 a.m. he sent a text message to Oldenburg that said, "Lol he is deep!" The trailer sustained a flat tire on the return trip, and at approximately 9:30 a.m., a sheriff's deputy stopped Hull. Hull identified himself as Lewis Wilczek and showed the officer Wilczek's driver's license. The deputy followed Hull to a service station. Hull paid for the tire repair with one of Wilczek's checks, and he returned the Bobcat skid loader and trailer at about 10:30 a.m. Also on May 1, someone identifying himself as Lewis Wilczek applied for a job at a construction company. The applicant met briefly with a human resources manager and stated that he had experience with welding, exhaust work, and metal fabrication.

At 1:14 p.m. on May 1, a teller at the St. Francis Credit Union received a call from someone who said he was Lewis Wilczek asking for the balance in his savings account and attempting to make a transfer of funds. The teller knew Wilczek and knew that he had been reported missing. The teller asked the caller for his birth date and social security number, and the caller correctly provided both. Next she asked the caller for his mother's maiden name.

The caller was silent for a moment and then hung up the phone. The teller dialed *69 to get the caller's phone number. She then called Wilczek's mother and the police. The police later determined that the telephone call to the teller was placed from Hull's apartment. The police learned later that at 1:24 p.m., a search for Wilczek's mother's maiden name was performed on the computer in Hull's apartment.

Wilczek's sister worked a night shift at the public safety department of St. Cloud State University on the night of May 1. Because the family knew that Wilczek had gone to meet Hull on the night Wilczek disappeared, Wilczek's sister asked her supervisor to search for Hull's address on the Department of Vehicle Services website. The supervisor provided an address in St. Cloud, and on the morning of Wednesday, May 2, Wilczek's sister drove around St. Cloud looking for the address. Although she never located the address she was looking for, she did spot Wilczek's pickup truck in the course of her search. The truck was missing its decals from Wilczek's business, Performance Exhaust. She saw a man put a laundry basket and a dog into the truck and drive away.

Wilczek's sister followed the truck and called the police, who eventually pulled the truck over. Hull was the driver, but he identified himself as Lewis Wilczek and produced Wilczek's driver's license. When Wilczek's sister told the officer that Hull was not her brother, Hull changed his story and gave his cousin's name—the same name he used to rent the apartment he shared with Oldenburg. Hull stated that he and Wilczek had gone to Montana together, and that Wilczek had stayed behind with a girl, sending Hull back to Minnesota in Wilczek's truck to collect some of Wilczek's property. The police searched the driver's license database for photos of Wilczek as well as Hull's cousin, whose name Hull gave, but neither photo matched Hull.

At that point, Wilczek's sister gave the police the name Jeremy Hull. A search of that name brought up Hull's photo, thus verifying the driver's identity. The search also revealed that several warrants had been issued for Hull's arrest for theft and driving offenses. Hull was then arrested.

The St. Cloud police briefly entered Hull's apartment and garage on the morning of his arrest to search for people. They found the apartment empty. The police then placed an evidence tape on the apartment and garage to prevent entry. Meanwhile Oldenburg received a call from an animal control officer regarding their dog. The dog had been delivered to an animal control center at the time of Hull's arrest. Oldenburg picked up the dog, brought it to a kennel, and then returned to the apartment. Once at the apartment, Oldenburg broke through the evidence tape and took several things out of the apartment, including the computer tower, various documents, the notebook with Hull's written plan, and Wilczek's cell phone. She hid the items removed from the apartment in cars located on her parents' property.

The next day, May 3, the police executed a search warrant at Hull's apartment and garage. They found Wilczek's Nike tennis shoes, titles and keys to vehicles owned by Wilczek and his family, a checkbook and some tax documents from Performance Exhaust, documents related to Hull's other aliases, the new motorcycle and clothing, among other things.

The next day, the police searched Wilczek's truck, where they found items including two shovels, a green dog leash, Hull's new cell phone, and boxes of Wilczek's personal checks. The police subsequently identified human blood and Wilczek's DNA on one of the shovels. The dog leash had

at least two DNA profiles on it; the predominant profile matched[1] Hull, and Wilczek could not be excluded as the contributor of a minor profile. That same day, Oldenburg gave the computer tower she had taken from the apartment to the police. Three days later, the police seized the notebooks containing Hull's writings from Oldenburg's parents' property during the execution of a search warrant on their property.

On May 5, investigators spent more than 14 hours processing the burn and burial sites, which had been located by police conducting an aerial search by helicopter after receiving a tip. The burn site "had a heavy odor of fuel," and later testing revealed the presence of a petroleum distillate such as diesel fuel. Some of the items found at the burn site were "silvery looking stickers that were similar to [others] found in the bed liner of Lewis Wilczek's truck," fabric with a plaid pattern, and metal rivets that looked like they came from jeans. The police also found several fragments of tissue and bone at the site.

Wilczek's body was subsequently found buried at a second location very near the burn site. According to the lead medical examiner, Wilczek's body was "dismembered, burned, some areas were charred, and a substantial portion ... was missing." The damage to Wilczek's body was so great that medical examiners were not able to precisely determine the cause of his death. Using various clues, however, the examiners concluded that an assault preceded Wilczek's death, and that he was unconscious, bleeding, and had vomited near the time of death. Hemorrhaging of blood in the right inner cheek, a broken tooth, and a jawbone fracture led the examiners to conclude that Wilczek sustained

at least two blunt-force blows to his jaw area before he died. The medical examiners concluded that most of the remaining damage to the body occurred after Wilczek's death. No soft tissues remained on the neck for the examiner to observe whether there was evidence of strangling. Sharp-force fractures that could have been inflicted by the shovel blade were observed on the bones of the face, arms, legs, vertebrae, and sacrum.

A Mille Lacs County grand jury later indicted Hull for one count of first-degree premeditated murder, in violation of Minn.Stat. § 609.185(a)(1) (2008), and one count of first-degree intentional murder while committing aggravated robbery, in violation of Minn.Stat. § 609.185(a)(3). Through counsel at trial, Hull admitted causing Wilczek's death but argued that the act was not premeditated or intentional. Hull presented the testimony of three witnesses who stated that he was not a violent person and had a reputation for peacefulness. The jury reached a verdict of guilty on both counts—first-degree premeditated murder and first-degree intentional murder while committing aggravated robbery. The district court then convicted Hull on the first-degree premeditated murder count and sentenced him to life in prison without the possibility of parole.

Hull now appeals his conviction. He argues that the admission at trial of two out-of-court statements made by Wilczek to third parties violated Hull's constitutional right to confront his accuser. Hull also argues that the district court erred by limiting the scope of testimony at a pretrial admissibility hearing regarding expert fingerprint and handwriting identifi-

1. The expert testified that the DNA profile on the dog leash "match[ed]" Hull because the profile "would not be expected to occur more than once among unrelated individuals in the world population."

cation evidence to the second prong of the *Frye–Mack* test. He also raises several other arguments in a supplemental pro se brief.

## I.

■ Hull challenges the admissibility of testimony from Wilczek's friend J.B. As characterized by Hull in his brief, J.B. testified "that Wilczek told him he was meeting [Hull] in St. Cloud because [Hull] owed him $2,500, and if [J.B.] did not hear from him after 6:00 p.m., something was wrong and he should call 911." More precisely, the transcript shows J.B. testified that Wilczek told him "that if [Wilczek] wasn't back by six o'clock that somethin' was probably wrong. And, and I thought he said call 911, but I'm not sure on that."

Hull's counsel objected to the admission of Wilczek's statement to J.B. on hearsay grounds but did not specifically identify a Confrontation Clause issue. Although no Minnesota case to date so states, other state courts have held that "a hearsay objection at trial is not sufficient to preserve a confrontation clause objection on appeal." *State v. Johnson*, 2009 S.D. 67, ¶ 16, 771 N.W.2d 360, 367 (quoting *State v. Divan*, 2006 S.D. 105, ¶ 9, 724 N.W.2d 865, 869). In *Vigil v. State*, 2004 WY 110, ¶ 15, 98 P.3d 172, 177, the Wyoming Supreme Court said that "separate objections should be made for hearsay violations and confrontation clause violations in order to fairly alert the trial court so it can make an informed decision based upon the specific legal issues involved." Here, we do not need to decide the effect, if any, of the hearsay objection on the appropriate standard of review on appeal because neither party has raised the issue. Rather, both sides agree that plain-error review applies.

■ An alleged error that is raised for the first time on appeal is subject to plain-error review and warrants reversal

if: (1) an error occurred in the district court, (2) the error was plain, and (3) the error affects the defendant's substantial rights. *State v. Jones*, 678 N.W.2d 1, 17 (Minn.2004). If the defendant satisfies this three-part test, we then ask whether the error seriously affects "the fairness, integrity, or public reputation of the judicial proceeding" before granting relief. *Id.* at 18.

We apply an identical analysis under both the state and federal Confrontation Clauses. *See* U.S. Const. amend. VI; Minn. Const. art. I, § 6; *State v. Holliday*, 745 N.W.2d 556, 564 (Minn.2008). The United States Supreme Court has held that out-of-court testimonial statements in criminal cases may be admitted only if the witness is unavailable to testify and the defendant had a prior opportunity to cross-examine the witness. *Crawford v. Washington*, 541 U.S. 36, 68, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). No precise definition of "testimonial" appears in *Crawford*, but the Court said that "[a]n accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not," *id.* at 51, 124 S.Ct. 1354, and thus concluded that a statement "knowingly given in response to structured police questioning" fell "squarely within" the "testimonial" category. *Id.* at 53 & n.4, 124 S.Ct. 1354. Further, the Court in *Crawford* stated that the Confrontation Clause "does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted." *Id.* at 60 n.9, 124 S.Ct. 1354.

Here, Wilczek's prediction that something would be amiss if he did not return by 6:00 p.m. falls into the category of a "casual remark to an acquaintance" not "a formal statement" to a police officer. *See id.* at 51, 124 S.Ct. 1354. In addition, we conclude there was no error in the district

court's admission of the statement for a purpose other than the truth of its content. The statement was not admitted to show that something was in fact wrong when Wilczek did not call J.B. that evening, but rather, for the purpose of explaining J.B.'s efforts to locate Wilczek the following day. *See id.* at 60 n.9, 124 S.Ct. 1354. Therefore, we conclude that Wilczek's statement was not testimonial under *Crawford* and hold that no error, and thus no plain error, occurred when the court admitted J.B.'s report of this out-of-court statement by Wilczek.

## II.

■ The second statement that Hull argues should not have been admitted at trial was part of a police officer's testimony regarding a September 2006 call from Wilczek. On direct examination, the officer testified that Wilczek reported the theft of a large amount of cash and checks from his business. The officer testified that he responded to the call, collected evidence in the form of a partial footprint and a smudge of dirt on a door handle, but no suspect was ever apprehended. On cross-examination by Hull's counsel, the officer stated that Wilczek had named a suspect in the theft, and the suspect named was not Hull. On redirect examination, the State asked whether Hull's name had "come up in the course of the investigation." The officer said that it had, and that it had been given to the police by Wilczek. At trial, Hull's counsel did not object to this testimony; therefore, plain-error review applies on appeal. *Jones,* 678 N.W.2d at 17.

Hull argues that even though the officer testified that Wilczek's primary suspect in the theft case was not Hull, the redirect testimony implied that Hull was on a list of suspects. Hull therefore asserts that the statement was testimonial because Wilczek made the statement to the police for the purpose of assisting them in the investigation of a crime. We agree. Wilczek's naming of suspects to the police officer investigating the theft was a testimonial statement under *Crawford.* *See* 541 U.S. at 53, 124 S.Ct. 1354.

The State argues that even if the officer's statement identifying Hull as a possible suspect was testimonial hearsay, Hull "opened the door" to the testimony by first eliciting a hearsay statement from the officer that Wilczek did not think Hull had committed the theft. We are not persuaded by this argument. The State, not Hull, called the officer to the stand to testify and the State elicited testimony about a theft reported by Wilczek. The only possible relevance of that evidence—introduced by the State—was the inference that Hull could have been the thief. Thus, the State opened the door to the discussion about the identity of suspects in that theft by raising an inference of Hull's guilt. The State cannot raise this inference and now complain about Hull's appropriate response—which was to elicit from the officer on cross-examination that Wilczek named a suspect who was not Hull. *See, e.g., State v. Carlson,* 264 N.W.2d 639, 642 (Minn.1978) (discussing the theory of "curative admissibility," whereby one party may introduce evidence to refute the impression created by the other party's evidence). We therefore reject the State's argument that Hull opened the door to the inadmissible testimony.

Even if Hull could be said to have "opened the door" to the officer's statement, our analysis under *Crawford* would not end at that point. We have not decided whether a defendant's "opening the door" to a constitutionally inadmissible statement can essentially operate as a waiver of the Confrontation Clause right. Cases from other jurisdictions have gone

both ways on this question. In *United States v. Cromer*, 389 F.3d 662, 679 (6th Cir.2004), the Sixth Circuit held that although the defendant invited the government to introduce a statement, its admission nonetheless constituted a violation of the constitutional right. The court reasoned that "[i]f there is one theme that emerges from *Crawford*, it is that the Confrontation Clause confers a powerful and fundamental right that is no longer subsumed by the evidentiary rules governing the admission of hearsay statements." *Id.* The Tenth Circuit disagreed, holding in a similar situation that the defendant "relinquished" the confrontation right by "explicitly open[ing] the door on a particular (and otherwise inadmissible) line of questioning." *United States v. Lopez–Medina*, 596 F.3d 716, 731 (10th Cir.2010).[2]

Although the district court's admission of the officer's testimony regarding Wilczek's statement was error, we conclude that the admission did not rise to the level of plain error. The officer's statement that Hull's name "came up" in the investigation immediately followed the contradictory statement that Hull was *not* the person Wilczek named as the suspect. The conclusion that Wilczek implicated Hull in his statement to the officer was thus ambiguous at best. We therefore hold that the district court's error in admitting this

statement does not rise to the level of plain error.

Even if plain error had occurred, we nonetheless conclude that Hull's substantial rights and the fairness of the proceeding were not affected. *See Jones*, 678 N.W.2d at 17–18. Through counsel, Hull repeatedly conceded during the trial that he was a dishonest person who had committed several crimes. The jury heard testimony about a long list of Hull's deceptive acts, including the theft of a pickup truck from Wilczek. We conclude that adding one more suspicious event of the same type to the list did not affect Hull's substantial rights because the added event could not have affected the jury's consideration of the sole issue in the case—whether Hull intended to cause Wilczek's death. *See State v. Schlienz*, 774 N.W.2d 361, 366 (Minn.2009) ("An error affects substantial rights if it is prejudicial and affect[s] the outcome of the case." (internal quotation marks omitted)). Accordingly, we hold that the admission of the officer's statement did not affect Hull's substantial rights.

## III.

 Hull also objects to evidence that the State presented at trial by a handwriting expert and a fingerprint identification expert. The handwriting expert offered an opinion that Hull was probably the

**2.** By concluding that Hull opened the door, Chief Justice Gildea in her concurrence reaches this open question and states that she would adopt the Tenth Circuit's rule. Because we conclude that Hull did not open the door here, we do not need to and in fact should not reach the issue of whether a defendant's opening the door to inadmissible evidence can amount to a waiver of the defendant's Confrontation Clause right.

That said, unlike the concurrence, we do not find *State v. DeZeler*, 230 Minn. 39, 45, 41 N.W.2d 313, 318 (1950), helpful in choosing between the Sixth Circuit's analysis in *Cromer*

and the Tenth Circuit's analysis in *Lopez–Medina*. *DeZeler*, which predates *Crawford* by more than 50 years, is simply a case about a traditional evidence principle: one who "opens the door" to a topic that is inadmissible under the rules of evidence cannot later object to the opponent's similarly inadmissible response. *Id.* at 45, 41 N.W.2d at 318. *DeZeler* tells us nothing about the applicability of that traditional principle to the weighty Confrontation Clause protection recognized by the United States Supreme Court in *Crawford*.

author of the following documents: the torn page containing the plan to kill Wilczek by stabbing him, the note that J.B. found on the door of Performance Exhaust, a letter sent from jail to Wilczek's parents, and several checks written on Wilczek's personal and business accounts. The fingerprint expert testified that known prints of Hull matched latent prints found on four items—the handle of a knife found in Wilczek's truck, the ripped notebook page containing the plan, the note found on the auto-shop door, and a check from Wilczek's business account.

■ Before trial, Hull moved for the exclusion of the testimony of both experts, and the district court conducted admissibility hearings regarding both fingerprint and handwriting evidence. The *Frye–Mack* standard that governs the admissibility of scientific expert testimony in Minnesota has two prongs. *State v. Roman Nose*, 649 N.W.2d 815, 818 (Minn. 2002) (citing *Frye v. United States*, 293 F. 1013, 1014 (D.C.Cir.1923), and *State v. Mack*, 292 N.W.2d 764, 768 (Minn.1980)). Under the first prong, the court asks "whether experts in the field widely share the view that the results of scientific testing are scientifically reliable." *Id.* at 819.[3] Under the second prong of the *Frye–Mack* test, the court considers "whether the laboratory conducting the tests in the individual case complied with appropriate standards and controls." This second prong of the *Frye–Mack* test arose in *State v. Schwartz*, 447 N.W.2d 422, 428 (Minn. 1989), where we held that "admissibility of specific test results in a particular case hinges on the laboratory's compliance with appropriate standards and controls, and

the availability of their testing data and results."

Having described the two prongs of our *Frye–Mack* test, we now proceed to review the district court's application of that test when deciding Hull's motion to exclude fingerprint and handwriting evidence. Upon motions from the State, the district court limited the scope of the hearings on both fingerprints and handwriting to the second prong of the *Frye–Mack* test. Regarding the fingerprint analysis, the court concluded that "fingerprints have been generally accepted as scientifically reliable for a long time." Based on this conclusion, the court informed the parties that the fingerprint hearing would be limited to the question of

> whether the procedures followed in this specific case where [sic] done in a generally accepted way that will give the reliability that [is] needed in order to consider the evidence, not as to the general acceptance of fingerprint analysis....

Responding to a similar motion from the State in the handwriting hearing, the court stated that "handwriting [analysis] is generally accepted in the community" and imposed a similar limitation on the handwriting hearing. Both rulings by the district court find support in our court's statement that "[w]hen the scientific technique that produces the scientific evidence is no longer novel or emerging, then the pretrial hearing should focus on the second prong of the *Frye–Mack* standard." *Roman Nose*, 649 N.W.2d at 819.

Hull now argues that the district court erred in limiting the admissibility hearings to the second *Frye–Mack* prong. He points out that we have never squarely

---

3. We agree with the position taken by Justice Meyer in her concurrence that "lengthy use of a method by law enforcement, and even lengthy unquestioning acceptance by courts, does not [by itself] exempt expert evidence from scrutiny under the first prong of *Frye–Mack*," but we need not decide the issue of whether the district court erred, because, as explained below, any such error was harmless.

held that either fingerprint analysis or handwriting analysis is generally accepted in the scientific community. Hull therefore asks us to remand his case to the district court for a complete *Frye–Mack* hearing.[4] The State relies on our past statements in dicta that "fingerprint comparisons ... are routinely used to prove that a particular person was present at a particular place or did a specific act[,]" *State v. Hodgson,* 512 N.W.2d 95, 98 (Minn.1994) (internal quotation marks omitted), and that handwriting analysis is "widely accepted by this court and others as a means to identify a signature as that of a particular signer." *State v. Anderson,* 379 N.W.2d 70, 79 (Minn.1985).

■ Where the district court has erred in admitting evidence, and the error does not have constitutional dimensions, we consider whether there is a "reasonable possibility that the wrongfully admitted evidence significantly affected the verdict." *State v. Rodriguez,* 754 N.W.2d 672, 684 (Minn.2008) (internal quotation marks omitted). Here, the State argues that any error in the admission of the fingerprint or handwriting experts' testimony was harmless because other evidence provided very strong support for the jury's key conclusions: that Hull authored the "plan" writings in the notebook and the note that was found on the door of Performance Exhaust, and by extension, that he premeditated Wilczek's murder.

We agree with the State that extensive evidence besides the fingerprint and hand-writing experts' testimony established that Hull was the author of the plan, note, and check. Both Oldenburg and Hull's sister identified Hull's handwriting on several documents. Oldenburg specifically testified that Hull authored the crucial document describing his plan to kill Wilczek, gave it to her to read, and discussed it with her. Further, the jury saw many examples of Hull's writing from which it could make its own comparisons and conclusions. And extensive circumstantial evidence of Hull's premeditation and intent was presented in the form of his prior attempts at identity theft, his act of destroying Wilczek's body, and the steps he took afterward to assume Wilczek's identity. Given this other evidence, we decline to decide whether the district court erred in failing to hold a complete *Frye–Mack* hearing before admitting the evidence. Instead, we hold that any error in the admission of either type of forensic evidence was harmless because we conclude that there is no reasonable possibility that the admission of the evidence significantly affected the verdict. *See State v. Fratzke,* 354 N.W.2d 402, 409 (Minn.1984) (declining to address the district court's admissibility determination "because any error in admitting the evidence was harmless.").

IV.

Hull raises seven arguments in a supplemental pro se brief, two of which we combine into one discussion regarding suffi-

---

4. Since the time of the admissibility hearings in this case, a committee of the National Academy of Sciences has issued a relevant report. The committee was formed by Congress in 2005 to conduct a study on forensic science. After several years of research, the committee published its nearly 350–page report concluding that: "In a number of forensic science disciplines, forensic science professionals have yet to establish either the validity of their approach or the accuracy of their conclusions, and the courts have been utterly ineffective in addressing this problem." Comm. on Identifying the Needs of the Forensic Sci. Cmty., Nat'l Research Council, *Strengthening Forensic Science in the United States: A Path Forward* 53 (2009), *available at* http://www.ncjrs.gov/pdffiles1/nij/grants/228091.pdf.

ciency of the evidence. We address each of Hull's arguments in turn.

*Lesser-included offenses*

 Hull argues that the district court erred when it denied his request for jury instructions on the lesser-included offenses of manslaughter in the first degree and manslaughter in the second degree. Such instructions are required where (1) the offense is a lesser-included offense of the offense charged, (2) "the evidence provides a rational basis for acquitting the defendant of the offense charged," and (3) "the evidence provides a rational basis for convicting the defendant of the lesser-included offense." *State v. Dahlin,* 695 N.W.2d 588, 595 (Minn.2005). Where "evidence exists to support the giving of the instruction, it is an abuse of discretion for a trial court judge to weigh the evidence or discredit witnesses and thereby deny an instruction." *Id.* at 598.

The district court denied Hull's request for both manslaughter instructions on the basis of the third element of the *Dahlin* test. *See id.* at 595. First, the court reasoned that the "level of bodily harm" sustained by Wilczek in the blunt-force assault to his face "exceed[ed] a misdemeanor level charge," and therefore denied the first-degree manslaughter instruction. Second, the court stated that "nothing in the evidence ... suggest[ed] that Mr. Wilczek's death was in any way caused by any form of negligence," and denied the second-degree manslaughter instruction as well. The court did instruct the jury on second-degree intentional murder and second-degree unintentional felony murder. We conclude that the record supports the district court's conclusions with respect to these instructions in all aspects, and hold that the court did not err when it did not give any instructions on manslaughter offenses.

*Change of Venue*

 Hull argues that the district court erred when it denied his motion for a change of venue on the basis of pre trial publicity. District courts have wide discretion in deciding whether to grant such motions. *State v. Chambers,* 589 N.W.2d 466, 473 (Minn.1999). Here, the court preliminarily denied the motion before the start of voir dire, and Hull did not renew his motion at the close of jury selection. We will not reverse a conviction on the basis of the denial of a change-of-venue motion absent a showing of prejudice. *Id.* Hull has not explained how the denial of the motion prejudiced him. The record reflects that the court took steps to ensure that the selected jurors had not been biased by any news they heard before the trial, and were not exposed to any publicity during the course of the trial itself. We hold that the district court did not err in denying Hull's motion for a change of venue.

*Jurors Seeing Hull in Handcuffs*

 Hull asserts that on the final day of trial, as he was brought to the courthouse, "a couple" of jurors allegedly saw him with handcuffs on his wrists. The restraints were removed before Hull entered the courtroom. Hull argues that his motion for a mistrial on the basis of the incident should have been granted.

We have said that appropriate steps should be taken to minimize exposure to the jury of the use of handcuffs on defendants at trial. *State v. Klinkert,* 271 Minn. 548, 549, 136 N.W.2d 399, 400 (1965). But we have distinguished the use of restraints inside the courtroom from the use of restraints "during transport to or from the courtroom[,]" which we said "is likely to be seen for just what it is—standard law enforcement practice." *State v. Shoen,* 598 N.W.2d 370, 378 (Minn.1999). When the

incident in question here was brought to the district court's attention, the court renewed its instruction to the State that Hull was not to be seen in restraints by the jury. But the court concluded that Hull was not prejudiced by the incident because the jury must have known that Hull was in custody. We hold that the court's denial of Hull's mistrial motion was not error. *See State v. Eling*, 355 N.W.2d 286, 292 (Minn.1984) (holding that the defendant was not denied his right to a fair trial where "the trial court took reasonable steps to minimize defendant's exposure in handcuffs to the jury's view but could not eliminate all risk.").

### Oldenburg's Credibility

■■■ Hull argues that his conviction should be overturned because Oldenburg's testimony was not credible and cannot be verified. But the credibility of witnesses and the weight of their testimony is for the jury's consideration. *See State v. Jones*, 347 N.W.2d 796, 801 (Minn.1984). At trial, Hull had ample opportunity to expose any weaknesses in Oldenburg's testimony via cross-examination. Moreover, the most crucial points in Oldenburg's testimony were corroborated by other evidence in the record, including Hull's notebook writings and the physical evidence of the burning and burial of Wilczek's body. Therefore we hold that Hull's argument about Oldenburg's testimony lacks merit.

### Sufficiency of the Evidence

■■■ Hull argues that the State did not present sufficient evidence for a jury to find him guilty beyond a reasonable doubt of first-degree premeditated murder under Minn.Stat. § 609.185(a)(1). But we conclude that the record contains more than ample evidence to support Hull's conviction, despite the absence of evidence regarding the precise location and manner of the murder. The fact that Hull caused

Wilczek's death was not at issue in this case. Intent and premeditation were the disputed elements. As to these elements, we conclude that the circumstantial evidence pointed unerringly to Hull's guilt. No other reasonable inferences can be drawn. *See, e.g., State v. McArthur*, 730 N.W.2d 44, 49 (Minn.2007) (stating the standard for sufficiency of the evidence challenges to circumstantial evidence cases.) We therefore hold that the evidence was sufficient to support the jury's verdict.

### Prosecutorial Error

■■■ Finally, Hull argues that the State committed prosecutorial error. Hull asserts that the State lied during its opening statement about Hull's rental of a storage shed and a plan to rent a P.O. Box in Wilczek's name around the time of Wilczek's death. The record supports the P.O. Box statement and reflects the possibility that the State made a mistake in its opening statement regarding the expiration date of a storage unit rental. But we fail to see how a misstatement of a detail of such attenuated relevance can reasonably be characterized as a lie or as prosecutorial error, and we therefore conclude that this argument also lacks merit.

Hull alleges further impropriety in the State's argument that the murder was about "payback," in the sense of revenge, rather than an encounter surrounding the "paying back" of a debt that went badly wrong. We conclude that the State's characterization of the evidence regarding Hull's motive to kill Wilczek is amply supported by the record, and we therefore hold that no prosecutorial error occurred.

Affirmed.

Concurring, GILDEA, C.J. and DIETZEN, J. Concurring, MEYER, J.

STRAS, J., not having been a member of this court at the time of the argument and submission, took no part in the consideration or decision of this case.

GILDEA, Chief Justice (concurring).

I agree with the majority that Hull's conviction should be affirmed, but I write separately to address one issue on which I part company from the majority's analysis. I disagree with the majority's conclusion that the district court erred in admitting Sergeant Strack's testimony that Hull's name came up during the course of law enforcement's investigation of a theft at Wilczek's business. Specifically, the majority holds that the admission of this evidence violated Hull's rights under the Confrontation Clause. I disagree.

I would hold that the district court did not err in admitting the challenged testimony because Hull opened the door to the State's redirect examination. On direct examination, the State did not elicit any information from Strack about Hull. The majority nonetheless finds that the State opened the door to the cross-examination about Hull's lack of involvement in the theft. The majority questions the relevance of Strack's testimony and speculates that "[t]he only possible relevance [of Strack's testimony] was the inference that Hull could have been the thief." But the State did not make this suggestion during its direct examination or during closing argument.

Moreover, the defense did not lodge a relevance objection to Strack's testimony. Rather, the defense used Strack to exonerate Hull of the theft by directly asking Strack if Wilczek had told the police that he thought he knew who had committed the crime and that "it was not Jeremy Hull." It was only after this cross-examination that the State elicited the testimony about which Hull now complains. By offering evidence that Hull was not responsible for the theft, the defense opened the door to the State's response.[1]

The majority concludes that even if the defense opened the door to the testimony at issue, the *Crawford* analysis "would not end." I disagree. The majority notes that we have not resolved the question of whether the defense's opening the door to inadmissible testimonial evidence waives the Confrontation Clause protection. But we have applied a similar principle outside the context of the Confrontation Clause. *See State v. DeZeler*, 230 Minn. 39, 45, 41 N.W.2d 313, 318 (1950) ("Where one party introduces inadmissible evidence, he cannot complain if the court permits his opponent in rebuttal to introduce similar inadmissible evidence."). I would follow the same analysis in this case.

I do not disagree with the majority that there is authority outside Minnesota to the contrary. *See United States v. Cromer*, 389 F.3d 662, 679 (6th Cir.2004) ("[T]he mere fact that Cromer may have opened the door to the testimonial, out-of-court statement that violated his confrontation

---

1. The majority cites *State v. Carlson*, 264 N.W.2d 639 (Minn.1978), to support its conclusion that "[t]he State cannot raise [the inference that Hull committed theft] and now complain about Hull's appropriate response— which was to elicit from the officer on cross-examination that Wilczek named a suspect who was not Hull." *Carlson* does not support the majority's conclusion. The question in *Carlson* was whether the defendant, who was convicted of selling marijuana, was entitled to

a mistrial because of testimony provided by one of the State's witnesses in response to a question defense counsel posed during cross-examination. *Id.* at 640. The defense argued that the witness' response was non-responsive and prejudicial because, in the non-responsive answer, the witness suggested that the defendant had been involved in prior drug sales. We upheld the district court's conclusion that the defendant was not entitled to a mistrial. *Id.* at 643.

right is not sufficient to erase that violation."). But, in my view, the better rule is that the defendant waives his confrontation right by opening the door to the testimonial evidence. This is the rule that many jurisdictions follow. *See United States v. Lopez–Medina*, 596 F.3d 716, 732 (10th Cir.2010) (holding that defendant waived his confrontation right by opening the door to the government's elicitation of the testimony at issue); *Tinker v. State*, 932 So.2d 168, 187–88 (Ala.Crim.App.2005); *State v. Birth*, 37 Kan.App.2d 753, 158 P.3d 345, 355 (2007); *People v. Ko*, 15 A.D.3d 173, 789 N.Y.S.2d 43, 45 (N.Y.App. Div.2005): *State v. Robinson*, 146 S.W.3d 469, 492–93 (Tenn.2004). This rule is also consistent with our analysis in *DeZeler. See* 230 Minn. at 45, 41 N.W.2d at 318.

Finally, as the Tenth Circuit recognized in rejecting the contrary rule from *Cromer*, "[i]f the *Cromer* rule were correct, a defendant would be free to mislead a jury by introducing only parts of an out-of-court statement, confident that the remainder of the statement could not be introduced because the Confrontation Clause would provide a shield." *Lopez–Medina*, 596 F.3d at 733 (internal quotation marks omitted). I would follow the analysis of the Tenth Circuit and hold that Hull waived his confrontation right, and that the district court therefore did not err in admitting the redirect testimony that Hull's name came up during the investigation.

DIETZEN, Justice (concurring).

I join in the concurrence of Chief Justice Gildea.

MEYER, Justice (concurring).

I concur in the result reached by the majority but write separately because I would address the substantive issue this case presents: whether Hull was entitled to a full *Frye–Mack* hearing on the admissibility of the State's expert testimony regarding handwriting and fingerprints. The majority skips over that analysis, preferring instead to affirm on harmlessness grounds. But because this issue has wide-ranging implications for future cases, we do a disservice to district courts and the administration of criminal justice in this state by declining to decide the issue on its merits.

The State argues that under *State v. Roman Nose*, 649 N.W.2d 815, 819 (Minn. 2002), the first prong of the *Frye–Mack* test applies only to novel and emerging scientific techniques, and thus the State need *never* meet its burden to show the reliability of fingerprint and handwriting identification methodology. But lengthy use of a method by law enforcement, and even lengthy unquestioning acceptance by courts, does not exempt expert evidence from scrutiny under the first prong of *Frye–Mack*. *Roman Nose* created no such exception for traditional forensic techniques.

Rather, *Roman Nose* simply stands for the proposition that, once this court has recognized that a technique has satisfied the requirements of the first prong of *Frye–Mack*, proponents of evidence based on that technique need not present the same reliability evidence over and over to district courts. *See Roman Nose*, 649 N.W.2d at 819–20. The district court may thereafter limit its admissibility analysis to the second prong, asking only whether the expert's conclusions in that case were reached by following the proper methods and procedures for that scientific technique. *Id.; State v. Schwartz*, 447 N.W.2d 422, 428 (Minn.1989) (establishing what later became the second prong of the *Frye– Mack* test).

The district court here applied *Roman Nose* in this way, limiting the scope of the

hearings on the admissibility of fingerprint and handwriting evidence. In so limiting the hearings, the court concluded that both types of forensic evidence meet our standard of scientific reliability under the first prong of the *Frye–Mack* test. But our precedent does not establish that conclusion. We said in *State v. Hodgson*, 512 N.W.2d 95, 98 (Minn.1994) (internal quotation marks omitted), that "fingerprint comparisons ... are routinely used to prove that a particular person was present at a particular place or did a specific act." And in *State v. Anderson*, 379 N.W.2d 70, 79 (Minn.1985), we said that handwriting analysis is "widely accepted by this court and others as a means to identify a signature as that of a particular signer." Those statements—both made in dicta—simply reiterated the noncontroversial fact that both fingerprints and handwriting have been used for many years. Neither case held that fingerprint comparison and handwriting analysis is evidence that meets the first prong of the *Frye–Mack* test. I would therefore hold that the district court erred when it limited the admissibility hearings in this case to the second prong of the test. The court should have conducted a complete *Frye–Mack* hearing in this case, requiring the State to meet its admissibility burden in full before accepting the evidence.

The State asks us to hold that, even if the district court erred in limiting the hearings in this case, the record demonstrates that the Analysis, Comparison, Evaluation, and Verification (ACE–V) fingerprint methodology and the methods of handwriting analysis pass the *Frye–Mack* test because they are generally accepted in the relevant scientific communities. Indeed, despite the limitation placed on the *Frye–Mack* hearings, the record contains considerable evidence from both parties relevant to the first prong question: whether the methodologies of ACE–V fingerprint analysis and handwriting analysis lead to accurate and reliable conclusions about whether a specific individual created a latent print or authored a particular document.

I would not hold on this record that either method meets the reliability requirement of *Frye–Mack*. Most fundamentally, the issue is not properly before us because the district court limited the development of the record and declined to rule on the first prong. Further, the evidence that Hull was permitted to present on reliability raises serious doubts about the State's ability to meet its reliability burden under the first prong. For example, one expert testified on behalf of Hull that although "the claim that latent print examiners can reach correct results when they do their analysis is amenable to validation testing," no such study has so far been conducted to determine whether the technique consistently reaches the correct result. The State presented evidence that a statistical model is currently being developed to assign probability values to fingerprint identification conclusions similar to the values that are currently available for DNA identification, but those studies are still in progress. Regarding handwriting, Hull presented the testimony of an expert who stated that no study has yet established that examiners can accurately match a piece of writing to its author, and that, in the expert's opinion, handwriting analysis methodology is too subjective to produce reliable results.

The report cited by the majority underscores these points, calling attention to a decades-long absence of scientific studies on these methods. *See* Comm. on Identifying the Needs of the Forensic Sci. Cmty., Nat'l Research Council, *Strengthening Forensic Science in the United States: A Path Forward* 8, 53 (2009), *available at* http://www.ncjrs.gov/pdffiles1/

nij/grants/228091.pdf (hereafter NRC Report). Such studies are necessary to satisfy the accuracy and reliability requirements of this court's *Frye–Mack* test. *See, e.g., Schwartz*, 447 N.W.2d at 425–28 (holding that forensic DNA typing identifications are accepted in the scientific community as reliable). As the majority notes, the NRC Report had not been published at the time of the pretrial hearings in this case. It is thus not part of the record. Nonetheless, the State cites the report in its brief, describes it as "helpful" and states that it "may properly be relied on by this Court."

The NRC Report states in no uncertain terms that the state and federal courts' longstanding acceptance of traditional forensic science expert opinions is simply not supported by good science. The report observes that courts "appear to be loath to insist on such research as a condition of admitting forensic science evidence in criminal cases, perhaps because to do so would likely demand more by way of validation than the disciplines can presently offer." NRC Report, *supra*, at 12 (internal quotation marks omitted). The report advises that "every effort must be made to limit the risk of having the reliability of certain forensic science methodologies judicially certified before the techniques have been properly studied and their accuracy verified." *Id.* at 86. In the report's chapter on the use of forensic evidence in litigation, the NRC Committee finds

> that the existing legal regime—including the rules governing the admissibility of forensic evidence, the applicable standards governing appellate review of trial court decisions, the limitations of the adversary process, and judges and lawyers who often lack the scientific expertise necessary to comprehend and evaluate forensic evidence—is inadequate to

the task of curing the documented ills of the forensic science disciplines.

*Id.* at 85.

The NRC Committee "decided ... that it would not be feasible to develop a detailed evaluation of each discipline in terms of its scientific underpinning, level of development, and ability to provide evidence...." *Id.* at 7. But the report does contain brief summaries of findings regarding individual forensic science fields. In its discussion of fingerprint analysis, the report concludes that such analysis is a "valuable tool" but the ACE–V method described by the State's witnesses in this case "is not specific enough to qualify as a validated method for this type of analysis" and "merely following the steps of ACE–V does not imply that one is proceeding in a scientific manner or producing reliable results." *Id.* at 142. The report's conclusion about handwriting analysis is that "[t]he scientific basis for handwriting comparisons needs to be strengthened," and only "limited research" has been done "to quantify the reliability and replicability of the practices used by trained document examiners," but "there may be some value in handwriting analysis." *Id.* at 166–67.

By highlighting these issues, I do not mean to suggest that fingerprint analysis, handwriting analysis, or any other forensic evidence method could never pass muster under our admissibility standards. But in order to present expert conclusions based on these methods to a jury, the proponent of the evidence must first meet its burden under the first prong of *Frye–Mack* to show that its forensic evidence methods produce accurate and reliable results. The district court erred in this case when it relieved the State of that burden.

I agree with the majority that because the contested evidence was cumulative of other overwhelming evidence of Hull's intent and premeditation, the district court's

error did not significantly affect the jury's verdict in this case. *See State v. Rodriguez,* 754 N.W.2d 672, 684 (Minn.2008). We therefore need not remand this case to the district court and Hull's conviction should be affirmed.